[No. G043266. Fourth Dist., Div. Three. Apr. 27, 2011.]

STANLEY ZALKIND et al., Plaintiffs, Cross-defendants and Appellants, v. CERADYNE, INC., Defendant, Cross-complainant and Appellant.

1012

1014

## Counsel

Charles D. Christopher for Plaintiffs, Cross-defendants and Appellants.

Stradling Yocca Carlson & Rauth, John F. Cannon, Kent W. Easter, Stephen L. Ram and Shane P. Criqui for Defendant, Cross-complainant and Appellant.

## Opinion

## FYBEL, J.—

### INTRODUCTION

Ceradyne, Inc. (Ceradyne), entered into an asset purchase agreement (Asset Purchase Agreement) with Stanley Zalkind and Elizabeth Zalkind (the Zalkinds) and Quest Technology, LP (Quest), a limited partnership owned by the Zalkinds. Under the terms of the Asset Purchase Agreement, Ceradyne

purchased all of Quest's assets for a price of $2.44 million, of which $300,000 was paid in cash and the remainder paid with unregistered shares of Ceradyne stock.

The Zalkinds and Quest later sued Ceradyne, asserting a single cause of action for breach of contract. The Zalkinds and Quest alleged Ceradyne breached the Asset Purchase Agreement by not obtaining timely registration with the Securities and Exchange Commission (SEC) of the Ceradyne stock. Ceradyne filed a cross-complaint against the Zalkinds and Quest, asserting a single cause of action for securities fraud in violation of Corporations Code section 25401. Ceradyne alleged the Zalkinds made misrepresentations and omitted material facts to inflate the value of Quest's assets.

Ceradyne moved for summary judgment on the complaint, and the Zalkinds and Quest moved for summary judgment on the cross-complaint. The trial court granted both motions, and all parties have appealed.

We affirm in full. As to Ceradyne's summary judgment motion, we conclude the Zalkinds and Quest's complaint was time-barred because it was not filed within the 24-month limitations period in section 14.4 of the Asset Purchase Agreement. We hold that the Asset Purchase Agreement's definition of indemnification and damages included the Zalkinds and Quest's direct claim for breach of contract against Ceradyne. We also hold the limitations period is reasonable and enforceable.

As to the Zalkinds and Quest's summary judgment motion, we conclude that under Corporations Code section 25501, Ceradyne has no damages and cannot obtain rescission of the Asset Purchase Agreement. We hold the term "the complaint" referred to in section 25501's definition of a seller's damages means the pleading filed by the seller of the security that asserts a violation of Corporations Code section 25401 (here, Ceradyne's cross-complaint).

FACTS

Ceradyne designs and manufactures advanced technical ceramic products for industrial, automotive, defense, and commercial uses. Quest, a limited partnership, was an original equipment manufacturer of injection-molded ceramic components. As of May 2004, the Zalkinds owned a 99 percent interest in Quest.

In May 2004, the Zalkinds and Quest entered into the Asset Purchase Agreement with Ceradyne, by which the Zalkinds agreed to sell Quest's assets to Ceradyne for $2.44 million, of which $300,000 was paid in cash and the balance paid with unregistered shares of Ceradyne (the stock consideration).

Section 8.10 of the Asset Purchase Agreement required Ceradyne to use its best efforts to register the stock consideration with the SEC. Registration would permit the stock consideration to be publicly traded. Ceradyne was required to file a form S-3 registration statement within 30 days of the closing date of the Asset Purchase Agreement. Section 3.1(b)(ii) of the Asset Purchase Agreement provides: "If the Registration Statement covering the Stock Consideration is not declared effective by the SEC on or before November 30, 2004, then within ten (10) days of such date, [Ceradyne] shall make a cash payment to the Selling Parties in the amount of $2,140,000, against delivery by the Selling Parties to [Ceradyne] of duly-endorsed stock certificates constituting the Stock Consideration."

Section 14 of the Asset Purchase Agreement is entitled "Indemnification." Section 14.2 provides that Ceradyne "shall indemnify, hold harmless and defend the Selling Parties and their respective successors and assigns . . . from and against any and all Damages that arise from or are in connection with: [¶] (a) Any breach of or inaccuracy ·in any of the representations or warranties of any of [Ceradyne] contained in <u>Section 6</u> of this Agreement or in any of the certificates delivered hereunder by or on behalf of [Ceradyne] pursuant to such representations or warranties; or [¶] (b) Any breach or default by [Ceradyne] of its covenants or agreements contained in this Agreement." Section 14.1 similarly provides that Quest and Stanley Zalkind agree to "indemnify, hold harmless and defend" Ceradyne from and against any and all "Damages."

Section 14.3 of the Asset Purchase Agreement states: " '<u>Damages</u>,' as used in this <u>Section 14</u>, shall mean: (i) demands, claims, actions, suits, investigations and legal or other proceedings brought against any indemnified party or parties, and any judgments or assessments, fines or penalties rendered therein or any settlements thereof, and (ii) all liabilities, damages, losses, Taxes, assessments, costs and expenses (including, without limitation, reasonable attorneys' and accountants' fees and expenses) incurred by any indemnified party or parties, to the extent not reimbursed or paid for by insurance, whether or not they have arisen from or were incurred in or as a result of any demand, claim, action, suit, assessment or other proceeding or any settlement or judgment."

Section 14.4(a) of the Asset Purchase Agreement provides that "[n]o claim for indemnification under this <u>Section 14</u> may be made more than twenty-four (24) months after the Closing Date [(May 14, 2004)]," with exceptions not applicable here.

Pursuant to the Asset Purchase Agreement, the Zalkinds received 71,397 shares of Ceradyne common stock based on the average closing price of

$29.973 per share for the 10 days preceding the closing date of May 14, 2004. These shares grew to 107,095.5 after Ceradyne had a three-for-two stock split.[1]

On August 19, 2004, Ceradyne filed the form S-3 registration statement with the SEC for the stock consideration. On September 28, 2004, Stanley Zalkind and Ceradyne's chief financial officer agreed to extend the Asset Purchase Agreement's deadline for registering the stock consideration in section 3.1(b)(ii) for one month from the original date of November 30, 2004. Between November 2004 and March 2005, Ceradyne filed three separate amendments to the form S-3 in response to correspondence from the SEC. The Zalkinds did not invoke section 3.1(b)(ii) of the Asset Purchase Agreement and demand $2.14 million in cash from Ceradyne for failure to timely register the stock consideration. On March 15, 2005, the SEC declared the registration of the stock consideration to be effective.

By April 15, 2005, the Zalkinds had sold 106,500 shares of the stock consideration. Their proceeds from the public sales were $2,351,669.61 based on an average selling price of $22.08 per share.

After May 14, 2004, Quest was operated as a division of Ceradyne with Stanley Zalkind and other key employees still in place. For the remainder of 2004, the Quest division had sales of about $1 million and net income of about $41,000. In 2005, the Quest division experienced a net loss of $33,814, in 2006 a loss of $564,576, and in 2007 a loss of $696,598. In 2007, Ceradyne terminated Stanley Zalkind's employment.

### PROCEDURAL HISTORY

In June 2008, the Zalkinds and Quest filed a complaint against Ceradyne, alleging breach of the registration requirements of section 8.10 of the Asset Purchase Agreement. The Zalkinds and Quest filed a first amended complaint, the operative pleading, in October 2008.

The first amended complaint alleged that Ceradyne breached section 8.10 of the Asset Purchase Agreement by failing to file the form S-3 registration statement within 30 days of May 14, 2004, and by failing to use best efforts to cause the stock consideration to be registered by the SEC. The first amended complaint also alleged the delay in registering the stock consideration meant the Zalkinds could not take advantage of a temporary and

---

[1] In the remainder of the opinion, we will use 107,095 as the number of Ceradyne shares owned by the Zalkinds following the stock split. Ceradyne uses 107,095 in making its damages calculations in the respondent's brief. Using 107,095 instead of 107,095.5 makes no material difference in any of the calculations and has no effect on the outcome of the appeals.

significant rise in the price of Ceradyne shares between December 31, 2004, and January 12, 2005. The Zalkinds were damaged, according to the first amended complaint, because if they had been able to sell their Ceradyne shares during that time period, they would have realized $1,479,444.50 more than they ultimately did.

After conducting discovery, Ceradyne filed a cross-complaint against the Zalkinds and Quest in May 2009. The cross-complaint asserted a single cause of action for violation of Corporations Code section 25401 and alleged the Zalkinds made a series of false and misleading statements and omissions of material fact about Quest's revenue projections and customer and market opportunities to induce Ceradyne to enter into the Asset Purchase Agreement and purchase Quest's assets. The cross-complaint sought damages and rescission of the Asset Purchase Agreement.

Ceradyne moved for summary judgment on the first amended complaint on the ground, among others, the Zalkinds and Quest's lawsuit constituted a claim for indemnification under section 14 of the Asset Purchase Agreement but was not filed within 24 months of the closing date of May 14, 2004. The Zalkinds and Quest moved for summary judgment on the cross-complaint on the ground, among others, that Ceradyne suffered no damages under Corporations Code section 25501.

The trial court took the motions under submission after hearing argument of counsel and issued a minute order on November 6, 2009, granting both motions. On December 2, the court signed an order submitted by the Zalkinds and Quest, stating: "Plaintiffs' summary judgment motion is granted with respect to the Cross-complaint on the grounds Cross-Complainant has not suffered any damages and rescission is unavailable because the parties cannot be returned to the status quo ante. Summary judgment i[s] not warranted on any other bases proffered by Plaintiffs. [¶] . . . Cross-[complainant]'s summary judgment motion is granted with respect to the Complaint on the grounds the two-year limitations provision in section 14.4 of the Asset Purchase Agreement executed by the parties bars Plaintiffs' claims. Summary judgment i[s] not warranted on any other bases proffered by Cross-complainant[]."

Judgment was entered on December 14, 2009. After entry of judgment, Ceradyne moved to correct a "clerical error" in the order granting summary judgment, or, alternatively, for reconsideration. In the motion, Ceradyne asserted the statement "Summary judgment i[s] not warranted on any other bases proffered by Cross-complainant[]" was inconsistent with the trial court's tentative ruling, argument and findings at oral argument, and the court's minute order. Ceradyne also asserted the order granting summary

judgment did not comply with Code of Civil Procedure section 437c, subdivision (g). The trial court denied the motion, stating: "Any error in including that statement without stating the grounds for it would be judicial not clerical error. The Court intended to include the statement in the order."

## STANDARD OF REVIEW

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.] We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

## DISCUSSION: THE ZALKINDS AND QUEST'S APPEAL

The trial court concluded the Zalkinds and Quest's complaint was time-barred because it was not filed within the 24-month limitations period prescribed by section 14.4 of the Asset Purchase Agreement. It was undisputed the Zalkinds and Quest filed their lawsuit for breach of contract against Ceradyne more than 24 months after the closing date. If the lawsuit for breach of contract filed by the Zalkinds and Quest is a "claim for indemnification" under section 14 of the Asset Purchase Agreement, then their complaint is time-barred.

After examining the language of section 14 of the Asset Purchase Agreement and relevant law on the meaning of indemnification, we agree with Ceradyne the term "claim for indemnification" as used in the Asset Purchase Agreement includes the Zalkinds and Quest's breach of contract action.

### I.

### THE ZALKINDS AND QUEST'S COMPLAINT WAS TIME-BARRED BECAUSE IT WAS NOT FILED WITHIN THE 24-MONTH LIMITATIONS PERIOD IN SECTION 14.4 OF THE ASSET PURCHASE AGREEMENT.

### A.

### *The Issue: Does the Term "Indemnify" in Section 14.2 of the Asset Purchase Agreement Include Direct Actions Between the Parties?*

Section 14.4 of the Asset Purchase Agreement states, in relevant part, "[n]o claim for indemnification under this <u>Section 14</u> may be made more than

twenty-four (24) months after the Closing Date . . . ." If a lawsuit for breach of contract is a "claim for indemnification" under section 14 of the Asset Purchase Agreement, then the Zalkinds and Quest's complaint is time-barred.

What does "claim for indemnification" under section 14.4 of the Asset Purchase Agreement mean?

The Zalkinds and Quest argue indemnification under section 14.4 of the Asset Purchase Agreement covers "only claims involving liability or potential liability to third parties or obligations imposed on a party by operation of law" and therefore does not apply to their direct claims against Ceradyne for its alleged breach of the Asset Purchase Agreement. Ceradyne argues the 24-month limitations period of section 14 applies to the Zalkinds and Quest's complaint because section 14 was drafted broadly to encompass "both direct, garden variety breach of contract claims between the parties and claims arising from third parties."

■ The parties agree the Asset Purchase Agreement was a fully integrated contract and there is no extrinsic evidence relating to section 14.[2] (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc., supra*, 109 Cal.App.4th at pp. 953–954.) We therefore look to the language of the Asset Purchase Agreement itself. (*Id.* at p. 956.) "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] 'The words of a contract are to be understood in their ordinary and popular sense.' " (*Id.* at p. 955.) When, as in this case, no extrinsic evidence is introduced, the appellate court independently construes the contract. (*Id.* at pp. 955–956.)

Section 14.2 of the Asset Purchase Agreement provides in relevant part: "Subject to the limitations in <u>Section 14.4</u> hereof, the Buyer shall indemnify, hold harmless and defend the Selling Parties and their respective successors and assigns . . . from and against any and all Damages that arise from or are in connection with: [¶] . . . [¶] (b) Any breach or default by the Buyer of its covenants or agreements contained in this Agreement."

---

[2] In the trial court, the Zalkinds and Quest submitted the declaration of Stanley Zalkind, in which he expressed his subjective understanding of the meaning of section 14 of the Asset Purchase Agreement. The trial court correctly sustained Ceradyne's objections to those parts of Stanley Zalkind's declaration. We have stated, "California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation' [citation]. The parties' undisclosed intent or understanding is irrelevant to contract interpretation. [Citations.]" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 [135 Cal.Rptr.2d 505].)

Section 14.3 of the Asset Purchase Agreement states: " 'Damages,' as used in this Section 14, shall mean: (i) demands, claims, actions, suits, investigations and legal or other proceedings brought against any indemnified party or parties, and any judgments or assessments, fines or penalties rendered therein or any settlements thereof, and (ii) *all* liabilities, *damages, losses*, Taxes, assessments, costs and expenses (including, without limitation, reasonable attorneys' and accountants' fees and expenses) *incurred by any indemnified party or parties*, to the extent not reimbursed or paid for by insurance, whether or not they have arisen from or were incurred in or as a result of any demand, claim, action, suit, assessment or other proceeding or any settlement or judgment." (Italics added.)

If the word "Damages" in section 14.2 of the Asset Purchase Agreement is replaced by the italicized language from section 14.3, and the words "Buyer" and "Selling Parties" are replaced with the parties' names, the result is the following: "[Ceradyne] shall indemnify, hold harmless and defend the [Zalkinds and Quest] . . . from and against any and all damages, losses incurred by [the Zalkinds and Quest] that arise from or are in connection with: [¶] . . . [¶] (b) Any breach or default by [Ceradyne] of its covenants or agreements contained in this Agreement."

The Zalkinds and Quest alleged they incurred damages and loss arising from Ceradyne's breach of its covenants or agreements contained in the Asset Purchase Agreement. The issue comes down to the meaning of "[Ceradyne] shall indemnify" such loss. Does "indemnify" have the narrow meaning, asserted by the Zalkinds and Quest, of reimbursement for losses to third party claims, or does it have the broader meaning, asserted by Ceradyne, of paying for or reimbursing any claimed loss?

### B.

*Although the Terms "Indemnify" and "Indemnity"*
*Ordinarily Refer to Third Party Claims, They May Include*
*Direct Claims, Depending on the Parties' Intent.*

The terms "indemnify" and "indemnity" have been defined in several ways. "Indemnity may be defined as the obligation resting on one party to make good a loss or damage another party has incurred." (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97] (*Rossmoor*).) Civil Code section 2772 defines "indemnity" as "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." The indemnitor is the party obligated to pay another, and the indemnitee is the party entitled to

receive the payment from the indemnitor. (*Maryland Casualty Co. v. Bailey & Sons, Inc.* (1995) 35 Cal.App.4th 856, 864 [41 Cal.Rptr.2d 519].)

██ Indemnity generally refers to third party claims. "A clause which contains the words 'indemnify' and 'hold harmless' is an indemnity clause which generally obligates the indemnitor to reimburse the indemnitee for any damages the indemnitee becomes obligated to pay third persons. [Citation.] Indemnification agreements ordinarily relate to third party claims." (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 969 [17 Cal.Rptr.2d 242] (*Myers*); see also *Queen Villas Homeowners Assn. v. TCB Property Management* (2007) 149 Cal.App.4th 1, 5 [56 Cal.Rptr.3d 528] [quoting *Myers*]; *Wilshire-Doheny Associates, Ltd. v. Shapiro* (2000) 83 Cal.App.4th 1380, 1396 [100 Cal.Rptr. 2d 478] (*Wilshire-Doheny*) [" '[A]n indemnitor in an indemnity contract *generally* undertakes to protect the indemnitee against loss or damage through liability to a third person.' "].) " 'Contracts of indemnity are distinguishable from those of guaranty and suretyship in that in indemnity contracts the engagement is to make good and save another from loss upon some obligation which he has incurred or is about to incur to a third person, and is not, as in guaranty and suretyship, a promise to one to whom another is answerable.' " (*Somers v. United States F. & G. Co.* (1923) 191 Cal. 542, 547 [217 P. 746].)

Although indemnity generally relates to third party claims, "this general rule does not apply if the parties to a contract use the term 'indemnity' to include direct liability as well as third party liability." (*Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 555 [21 Cal.Rptr.3d 322].) "[E]ach indemnity agreement is 'interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract.' " (*Wilshire-Doheny, supra*, 83 Cal.App.4th at p. 1396.) When indemnity is expressly provided by contract, the extent of the duty to indemnify must be determined from the contract itself. (*Rossmoor, supra*, 13 Cal.3d at p. 628; see also *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1277 [87 Cal.Rptr.2d 497] ["parties to an indemnity contract have great freedom of action in allocating risk, subject to certain limitations of public policy"]; *Rooz v. Kimmel* (1997) 55 Cal.App.4th 573, 583 [64 Cal.Rptr.2d 177] ["We must determine the scope of a contractual duty of indemnification . . . from the contract itself."]; *Myers, supra*, 13 Cal.App.4th at pp. 968–969 ["The extent of the duty to indemnify is determined from the contract."].)

██ "[T]he question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and

the language of the contract; of necessity, each case will turn on its own facts." (*Rossmoor, supra*, 13 Cal.3d at p. 633.) The indemnity provisions of a contract are to be construed under the same rules for interpreting contracts, " 'with a view to determining the actual intent of the parties.' " (*Wilshire-Doheny, supra*, 83 Cal.App.4th at p. 1396; see also *Maryland Casualty Co. v. Bailey & Sons, Inc., supra*, 35 Cal.App.4th at p. 864.)

## C.

*Section 14.2 of the Asset Purchase Agreement Is Written Broadly to Include Direct Claims and Does Not Expressly Exclude Them.*

█ The terms "indemnify" and "indemnity" do not necessarily refer only to third party claims and are reasonably susceptible to the interpretation urged by Ceradyne. As we have noted, the California Supreme Court has defined "indemnity" as "the obligation resting on one party to make good a loss or damage another party has incurred." (*Rossmoor, supra*, 13 Cal.3d at p. 628.) This definition is not limited to third party claims and is broad enough to include the Zalkinds and Quest's direct breach of contract claim against Ceradyne. One court has concluded the definition of "indemnity" in Civil Code section 2772 "plainly states that indemnity may apply to either direct or third party claims." (*Dream Theater, Inc. v. Dream Theater, supra*, 124 Cal.App.4th at p. 556, fn. 5.)

In *Wilshire-Doheny, supra*, 83 Cal.App.4th 1380, the court addressed the issue whether particular indemnity provisions were limited to third party claims. In that case, Stanley Shapiro and Jeffrey R. Matsen were corporate officers of Daishin U.S.A. Co., Ltd. (Daishin USA). (*Id.* at p. 1384.) Pursuant to three different indemnity provisions, Daishin USA agreed to indemnify Shapiro and Matsen with respect to any action or claim brought against them in their capacity as corporate officers. (*Id.* at pp. 1387, 1394–1395.) Daishin USA sued Shapiro and Matsen, alleging various causes of action arising out of their conduct as corporate officers. (*Id.* at pp. 1385–1386.) Shapiro and Matsen prevailed at trial, but the trial court denied their motion for attorney fees, which was based on the indemnity provisions. (*Id.* at pp. 1387–1388.) The Court of Appeal reversed, rejecting the argument the indemnity provisions were limited to third party claims: "There is nothing in the language of any of the three indemnity provisions specifically limiting their application to third party lawsuits. [Daishin USA] point[s] to no extrinsic evidence introduced to demonstrate that the parties intended these provisions to apply to third party lawsuits only. [Citations.] Thus, it has not been shown the indemnity provisions are inapplicable merely because [Shapiro and Matsen] seek indemnification for attorney's fees and costs incurred in an action brought by the indemnitor . . . ." (*Id.* at p. 1396.)

Black's Law Dictionary broadly defines "indemnification" as "1. The action of compensating for loss or damage sustained. 2. The compensation so made." (Black's Law Dict. (8th ed. 2004) p. 783, boldface omitted.) Black's Law Dictionary similarly defines "indemnity" as "1. A duty to make good any loss, damage, or liability incurred by another. . . . 2. The right of an injured party to claim reimbursement for its loss, damage, or liability from a person who has such a duty. 3. Reimbursement or compensation for loss, damage, or liability in tort; esp., the right of a party who is secondarily liable to recover from the party who is primarily liable for reimbursement of expenditures paid to a third party .for injuries resulting from a violation of a common-law duty." (*Id.* at p. 784, boldface omitted.) The first definition in Black's Law Dictionary for "indemnify" is "[t]o reimburse (another) for a loss suffered because of a third party's or *one's own act or default.*" (*Id.* at pp. 783–784, italics added.)

■ Several Ninth Circuit Court of Appeals cases have adopted a similar definition of "indemnify" from the sixth edition of Black's Law Dictionary. (*Yang Ming Marine v. Okamoto Freighters Ltd.* (9th Cir. 2001) 259 F.3d 1086, 1092; *Atari Corp. v. Ernst & Whinney* (9th Cir. 1992) 981 F.2d 1025, 1031–1032.)[3] These cases hold an indemnity provision may encompass direct breach of contract claims. In *Atari, supra,* 981 F.2d at page 1031, the Ninth Circuit concluded the district court erred by limiting an indemnification provision to third party claims, stating "the district court was wrong to assume that the word 'indemnify' necessarily carries with it the baggage of the clauses in which it most frequently appears." The word "indemnify," the Ninth Circuit stated, "refers to compensation for loss in general, not just particular types of loss." (*Ibid.*)

■ In *Battelle Memorial Institute v. Nowsco Pipeline Services* (S.D. Ohio 1999) 56 F.Supp.2d 944, 950, the court defined "indemnity" to include "the shifting of losses, rather than any requirement that third party losses be involved." The court stated: "It is clear from both the Ohio and Sixth Circuit definitions of indemnification that a party wishing to narrow an indemnification clause to third-party damage is obligated to limit the scope of the clause expressly; and absent such express limitation, indemnification clauses may apply to damage suffered by the contracting parties themselves." (*Id.* at p. 951.) In this case, section 14 of the Asset Purchase Agreement does not expressly limit the meaning of "indemnify" to third party claims, and, as we have mentioned, there is no extrinsic evidence relating to section 14.

---

[3] The sixth edition of Black's Law Dictionary defines "indemnify" as: " 'To restore the victim of a loss, in whole or in part, by payment, repair, or replacement. To save harmless; to secure against loss or damage; to give security for the reimbursement of a person in case of an anticipated loss falling upon him. To make good; to compensate; to make reimbursement to one of a loss already incurred by him.' " (*Atari Corp. v. Ernst & Whinney, supra,* 981 F.2d at pp. 1031–1032, quoting Black's Law Dict. (6th ed. 1990) p. 769.)

Section 14.2 and the definition of damages in section 14.3 of the Asset Purchase Agreement are broadly worded to provide that Ceradyne "shall indemnify, hold harmless and defend" the Zalkinds and Quest from and against "any and all" damages and losses incurred by the Zalkinds and Quest "that arise from or are in connection with: [¶] . . . [¶] . . . [a]ny breach or default by [Ceradyne] of its covenants or agreements contained in this Agreement." This language does not limit indemnification to third party claims and extends indemnification to "any and all" damages incurred by the Zalkinds and Quest arising out of Ceradyne's breach of the Asset Purchase Agreement. Read in the context of section 14.2, the word "indemnify" makes better sense when read to mean "make good," "reimburse," or "compensate."

D.

*Other Parts of Section 14 of the Asset Purchase Agreement*
*Support the Conclusion "Indemnify" Includes Direct Claims*
*Between the Parties.*

■ Another indication of the meaning of "indemnify" in section 14.2 of the Asset Purchase Agreement comes from the use of the terms "indemnity," "indemnify," and "damages" in other parts of section 14. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) To the extent practicable, the meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless. (*Sy First Family Ltd. Partnership v. Cheung* (1999) 70 Cal.App.4th 1334, 1342 [83 Cal.Rptr.2d 340]; *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473 [80 Cal.Rptr.2d 329].)

Section 14.3 of the Asset Purchase Agreement defines the term "damages" by dividing them into two categories. The first category is "demands, claims, actions, suits, investigations and legal or other proceedings brought against any indemnified party or parties, and any judgments or assessments, fines or penalties rendered therein or any settlements thereof." This category correlates to indemnification of third party claims. The second category is "all liabilities, damages, losses, Taxes, assessments, costs and expenses (including, without limitation, reasonable attorneys' and accountants' fees and expenses) incurred by any indemnified party or parties, to the extent not reimbursed or paid for by insurance, whether or not they have arisen from or were incurred in or as a result of any demand, claim, action, suit, assessment or other proceeding or any settlement or judgment." This category would include damages sought in a direct lawsuit between the parties. The clause

"whether or not they have arisen from or were incurred in or as a result of any demand, claim, action, suit, assessment or other proceeding or any settlement or judgment" in particular suggests the second category is not limited to third party claims for which a party to the Asset Purchase Agreement seeks indemnity.

Section 14.5 of the Asset Purchase Agreement is entitled "Notice of Claims." The first sentence of section 14.5 requires prompt notification to the indemnifying party of a claim for indemnity. The second and third sentences distinguish third party claims. The second sentence reads: "In the event of any claim for indemnification hereunder resulting from or in connection with any claim or legal proceeding by a third party, the notice to the indemnifying party shall specify, if known, the amount or any estimate of the amount of the liability arising therefrom." The third sentence provides that neither the indemnified party nor any indemnifying party may settle a claim by a third party without the other party's prior written consent. There would be no need to distinguish third party claims in section 14.5 if "indemnify" only referred to third party claims.

Section 14.6 of the Asset Purchase Agreement is entitled "Third Party Claims" and concerns the indemnifying party's defense obligations. Section 14.6 states, "[i]n connection with any claim giving rise to indemnity hereunder that results or may result from or arises or may arise out of any claim or legal proceeding by a person who is not a party to this Agreement . . . ." This section would not be necessary if indemnification by definition meant only third party claims.

Section 14.8 of the Asset Purchase Agreement, entitled "Subrogation," states, "[i]n the event that an indemnifying party pays all or any portion of a third party claim or demand concerning which the indemnified party submits a claim for indemnification . . . , the indemnifying party shall be subrogated." This passage expressly recognizes subrogation rights to third party claims and would be unnecessary if, by definition, indemnification only applied to third party claims.

Section 14.9 of the Asset Purchase Agreement, entitled "Remedies," states: "The indemnification rights and remedies set forth in this Section 14 shall be the sole and exclusive rights and remedies of the parties hereto with respect to any Damages incurred by any such parties for which indemnification is provided to such parties under this Section 14; provided, however, that if the Selling Parties fail to perform their covenant to sell the Purchased Assets to the Buyer, Buyer shall be entitled to obtain specific performance of such covenant, and injunctive relief against any breach or threatened breach thereof." The part after the second "provided" would be unnecessary if indemnification only referred to third party claims.

Many provisions in section 14 of the Asset Purchase Agreement therefore support the conclusion the parties intended the term "indemnify" in section 14.2 to have the broader meaning and to encompass direct claims for breach of contract. If the term "indemnify" were. limited to third party claims, portions of sections 14.3, 14.5, 14.6, 14.8, and 14.9 would be superfluous.

The Zalkinds and Quest argue the references to third party claims in those sections of the Asset Purchase Agreement were meant to distinguish third party claims from claims arising by operation of law, i.e., liabilities that arise without a demand or claim, such as environmental cleanup. This interpretation might be convincing if the term "indemnify" necessarily refers only to third party claims, as the Zalkinds and Quest argue. However, the term "indemnify" in section 14 is subject to the broader definition that encompasses direct claims, and section 14, read as a whole, makes better sense with that interpretation, rather than the narrow interpretation limiting "indemnify" to third party claims.

The Zalkinds and Quest argue Ceradyne's interpretation of section 14 of the Asset Purchase Agreement would require Ceradyne to defend them in this lawsuit. That result would obtain if section 14.2 were read in isolation: Section 14.2 does require the indemnifying party to "indemnify, hold harmless *and defend.*" (Italics added.) But section 14.2 must be read with section 14.6, which sets forth the rights and duties of defense and applies only to third party claims, and the balance of the Asset Purchase Agreement.

II.

AGREEMENTS TO SHORTEN THE STATUTE OF LIMITATIONS ARE ENFORCEABLE IF REASONABLE, AND CIVIL CODE SECTION 2778 IS INAPPLICABLE BASED ON THE TERMS OF SECTION 14 OF THE ASSET PURCHASE AGREEMENT.

The Zalkinds and Quest argue we must strictly construe the language of section 14 of the Asset Purchase Agreement against Ceradyne because agreements to shorten the statute of limitations are disfavored. In *Lewis v. Hopper* (1956) 140 Cal.App.2d 365, 367 [295 P.2d 93] (*Lewis*), the court stated: " '[C]ontractual stipulations which limit the right to sue to a period shorter than that granted by statute, are not looked upon with favor because they are in derogation of the statutory limitation. Hence, they should be construed with strictness against the party invoking them.' " (See also *Sanders v. American Casualty Co.* (1969) 269 Cal.App.2d 306, 309 [74 Cal.Rptr. 634] ["this general rule is correct . . ."].) In *Western Filter Corp. v. Argan, Inc.* (9th Cir. 2008) 540 F.3d 947, 952, the court cited that rule and the *Lewis* case with approval; however, no published California opinion has done so in the over 40 years since *Sanders v. American Casualty Co.* in 1969.

 As Ceradyne argues, agreements to shorten the statute of limitations do not violate public policy and are enforced if reasonable. "Courts generally enforce parties' agreements for a shorter limitations period than otherwise provided by statute, provided it is reasonable." (*Moreno v. Sanchez* (2003) 106 Cal.App.4th 1415, 1430 [131 Cal.Rptr.2d 684]; see also *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 183 [51 Cal.Rptr.3d 471]; *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1548 [46 Cal.Rptr.2d 33].) Long before *Lewis*, the California Supreme Court held, "[i]t is a well-settled proposition of law that the parties to a contract may stipulate therein for a period of limitation, shorter than that fixed by the statute of limitations, and that such stipulation violates no principle of public policy, provided the period fixed be not so unreasonable as to show imposition or undue advantage in some way. [Citations.]" (*Beeson v. Schloss* (1920) 183 Cal. 618, 622–623 [192 P. 292]; see also *Tebbets v. Fidelity and Casualty Co.* (1909) 155 Cal. 137, 139 [99 P. 501] [statute of limitations is a personal right that can be waived or shortened].)

The Zalkinds and Quest do not contend the shorter limitations period of section 14 of the Asset Purchase Agreement is unreasonable.[4] As an agreement to shorten the statute of limitations does not violate public policy under California Supreme Court authority, we do not agree that section 14 must be " 'construed with strictness' " against Ceradyne and decline to follow *Lewis*. Even if we would construe that contract provision with "strictness," we would still enforce it under the Supreme Court authority cited in the prior paragraph.

 The Zalkinds and Quest also argue that interpreting section 14 of the Asset Purchase Agreement to encompass direct breach of contract claims is contrary to Civil Code section 2778, which sets forth rules for interpreting contracts of indemnity.[5] True, each situation identified in section 2778

---

[4] "Reasonable" means the shortened period "provides sufficient time to effectively pursue a judicial remedy." (*Moreno v. Sanchez, supra,* 106 Cal.App.4th at p. 1430.)

[5] Civil Code section 2778 reads: "In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears: [¶] 1. Upon an indemnity against liability, expressly, or in other equivalent terms, the person indemnified is entitled to recover upon becoming liable; [¶] 2. Upon an indemnity against claims, or demands, or damages, or costs, expressly, or in other equivalent terms, the person indemnified is not entitled to recover without payment thereof; [¶] 3. An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion; [¶] 4. The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity, but the person indemnified has the right to conduct such defenses, if he chooses to do so; [¶] 5. If, after request, the person indemnifying neglects to defend the person indemnified, a recovery against the latter suffered by him in good faith, is conclusive in his favor against the former; [¶] 6. If the person indemnifying, whether he is a principal or a surety

addresses indemnification of third party claims. But, as Ceradyne points out, section 2778 expressly states its rules of interpretation apply, *"unless a contrary intention appears."* (Italics added.) Here, we conclude, a contrary intention appears from reading together the various parts of section 14 of the Asset Purchase Agreement. Further, as Ceradyne points out, the Asset Purchase Agreement does not refer to Civil Code section 2778, but does refer to other statutes when they are controlling.

## III.

### CONCLUSION

■ Claims for indemnification under section 14 of the Asset Purchase Agreement include direct claims between the parties. As a consequence, the 24-month limitations period of section 14.4 of the Asset Purchase Agreement applies to such direct claims. The Zalkinds and Quest did not file their complaint against Ceradyne within 24 months of the closing date; therefore, the complaint is time-barred and the trial court did not err by granting Ceradyne's motion for summary judgment. Because we are affirming on the ground the complaint was time-barred, we do not address Ceradyne's contention the trial court erred by rejecting Ceradyne's other grounds for summary judgment without specifying reasons.

### DISCUSSION: CERADYNE'S APPEAL

Ceradyne's cross-complaint alleged the Zalkinds violated Corporations Code section 25401 by making false statements and omissions in connection with the purchase and sale of the stock consideration under the Asset Purchase Agreement. Ceradyne sought damages and rescission of the Asset Purchase Agreement pursuant to Corporations Code section 25501. The trial court granted the Zalkinds and Quest's motion for summary judgment on the ground Ceradyne suffered no damages under section 25501 from the alleged violations of section 25401.

Ceradyne argues (1) the trial court misinterpreted Corporations Code section 25501 in concluding Ceradyne suffered no damages, and (2) Ceradyne may rescind the Asset Purchase Agreement despite the fact none of the parties to it can restore the consideration.

in the agreement, has not reasonable notice of the action or proceeding against the person indemnified, or is not allowed to control its defense, judgment against the latter is only presumptive evidence against the former; [¶] 7. A stipulation that a judgment against the person indemnified shall be conclusive upon the person indemnifying, is inapplicable if he had a good defense upon the merits, which by want of ordinary care he failed to establish in the action."

We conclude, based on the evidence presented in the moving and opposition papers and pertinent legal authorities:

1. The term "the complaint" as used in the formula for calculating a seller's damages under Corporations Code section 25501 means the pleading by which the seller of the security asserts the violation of Corporations Code section 25401.

2. Ceradyne (the seller of the security) asserted a violation of Corporations Code section 25401 in the cross-complaint; therefore, in this case, the term "the complaint" under Corporations Code section 25501 refers to Ceradyne's cross-complaint, not the complaint filed by the Zalkinds and Quest.

3. Because "the complaint" refers to Ceradyne's cross-complaint under Corporations Code section 25501's formula for calculating a seller's damages, Ceradyne suffered negative damages or no damages based on the undisputed facts.

4. Under the express provisions of Corporations Code section 25501, Ceradyne is not entitled to rescission because the undisputed facts are that the Zalkinds and Quest no longer own the security (the stock consideration) and Ceradyne cannot tender the consideration paid for the security.

I.

CERADYNE SUFFERED NO DAMAGES UNDER CORPORATIONS CODE SECTION 25501.

A.

*The Issue: In Calculating a Seller's Damages Under Corporations Code Section 25501, Does the Term "the Complaint" Include a Seller's Cross-complaint Alleging Securities Fraud?*

 Corporations Code section 25401 makes it unlawful to offer or sell a security by means of a written or oral communication that includes an untrue statement of material fact or omits a material fact. Corporations Code section 25501 provides that a seller of a security who violates section 25401 is liable to the purchaser of the security, who may sue for either rescission or damages.

Corporations Code section 25501 permits recovery of damages by a seller of a security, as follows: "Damages recoverable under this section by a seller

shall be an amount equal to the difference between (1) the value of the security at the time of the filing of *the complaint* plus the amount of any income received by the defendant on the security and (2) the price at which the security was sold plus interest at the legal rate from the date of sale." (Italics added.)

In this case, Ceradyne is the seller of the security—the stock consideration—and the Zalkinds are the buyers of the security. Ceradyne, the seller, asserted its securities fraud claim against the Zalkinds and Quest by cross-complaint. The issue is, does the term "the complaint" in Corporations Code section 25501 include a seller's cross-complaint, or is the term limited to the complaint, whether filed by the buyer or the seller?

Whether the term "the complaint" includes a seller's cross-complaint directly affects the amount, if any, of Ceradyne's damages. A seller's damages under Corporations Code section 25501 are the difference between "(1) the value of the security at the time of the filing of the complaint plus the amount of any income received by the defendant on the security and (2) the price at which the security was sold plus interest at the legal rate from the date of sale."

The Zalkinds and Quest filed the complaint on June 11, 2008. The value of the security on that date is calculated as follows: $38.43 per share x 107,095 shares = $4,115,661. (All numbers are rounded up or down to the nearest dollar.)

Ceradyne filed its cross-complaint on May 8, 2009. The value of the security on that date is calculated as follows: $19.94 per share x 107,095 shares = $2,135,474.

The Zalkinds received $223,800 in net income from selling 106,500 shares of Ceradyne stock between March 31 and April 12, 2005.[6] It is undisputed the Zalkinds paid $2,127,870 for the 106,500 shares of the stock consideration that they sold and received $2,351,670.

---

[6] We will assume for these purposes the term "any income received by the defendant on the security" includes net proceeds from the sale of the security. The Zalkinds and Quest argue they received no income on their Ceradyne stock because Ceradyne paid no dividends. We do not address Ceradyne's argument that income received by the Zalkinds and Quest on the security includes any recovery of damages in this lawsuit because we have affirmed the judgment against the Zalkinds and Quest on the complaint.

Based on the Asset Purchase Agreement, the price of the Ceradyne stock sold to the Zalkinds was $2.14 million.[7] Interest on that amount at the legal rate of 7 percent per annum[8] for the period from May 15, 2004 (the date of sale), to June 11, 2008 (the date the complaint was filed by the Zalkinds and Quest), is $610,692.[9] Interest on $2.14 million at the legal rate of 7 percent per annum for the period from May 15, 2004 (the date of sale), to May 8, 2009 (the date the cross-complaint was filed), is $746,127.[10]

The damages formula in Corporations Code section 25501 produces this result if "the complaint" in this case means the complaint filed by the Zalkinds and Quest:

(1) $4,115,661 (value of the stock when the complaint was filed) + $223,800 (income earned on the stock) = $4,339,461

minus

(2) $2,140,000 (sale price of the stock consideration) + $610,692 (interest to date the complaint was filed)

= 1,588,769 in damages.

The damages formula in Corporations Code section 25501 produces this result if "the complaint" in this case means Ceradyne's cross-complaint:

(1) $2,135,474 (value of stock when the cross-complaint was filed) + $223,800 (income earned on the stock) = $2,359,274

minus

---

[7] The price for the stock consideration was the value of the Quest assets, less $300,000 paid in cash. The Asset Purchase Agreement valued the Quest assets at $2.44 million. Ceradyne argues the value of Quest's assets was far less than $2.44 million, and, hence, the price for the stock consideration was less than $2.14 million.

[8] Unless the contract specifies differently, interest under Corporations Code section 25501 is 7 percent per annum. '(*Boam v. Trident Financial Corp.* (1992) 6 Cal.App.4th 738, 743, fn. 4 [8 Cal.Rptr.2d 177] (*Boam*).)

[9] Interest is calculated by applying the 7 percent rate to the price at which the stock consideration was sold to the Zalkinds ($2.14 million) from the date the stock consideration was sold (May 15, 2004) to the filing of the Zalkinds and Quest's complaint on June 11, 2008. Seven percent interest for four years (May 15, 2004, to May 14, 2008) is .07 x $2,140,000 x 4 = $599,200. Seven percent interest for the 28 days from May 15, 2008 to June 11, 2008, is (28 ÷ 365) x $2,140,000 x .07 = $11,492. The sum of $599,200 and $11,492 is $610,692.

[10] As explained in the previous footnote, 7 percent interest for four years (May 15, 2004, to May 14, 2008) is .07 x $2,140,000 x 4 = $599,200. Seven percent interest for the 358 days from May 15, 2008, to May 8, 2009, is (358 ÷ 365) x $2,140,000 x .07 = $146,927. The sum of $599,200 and $146,927 is $746,127.

(2) $2,140,000 (sale price of the stock consideration) + $746,127 (interest to date the cross-complaint was filed)

= *Negative* $526,853 thus, no damages.

The trial court concluded the valuation date for the stock pursuant to Corporations Code section 25501 was the date the seller's (Ceradyne's) cross-complaint was filed and, apparently accepting the later calculations, found Ceradyne suffered no damages.

## B.

### *The Legislature Typically Will Say Expressly Whether the Term "Complaint" Includes a Cross-complaint.*

██ The fundamental task of statutory interpretation is to ascertain the Legislature's intent to effectuate the statute's purpose. (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218].) In ascertaining the Legislature's intent, we first consider the language of the statute itself, giving the words used their ordinary meaning. (*Ibid.*) The statutory language must be construed in the context of the statute as a whole and the overall statutory scheme, giving significance to every word, phrase, sentence, and part of the statute. (*Ibid.*) If the statutory language is unambiguous, the plain meaning controls and consideration of extrinsic sources to determine the Legislature's intent is unnecessary. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 [129 Cal.Rptr.2d 811, 62 P.3d 54].) "When the words are susceptible to more than one reasonable interpretation, we consider a variety of extrinsic aids, including the statutory context and the circumstances of the statute's enactment, in determining legislative intent." (*Levy v. Superior Court* (1995) 10 Cal.4th 578, 582 [41 Cal.Rptr.2d 878, 896 P.2d 171].) We read the statute as a whole in order to harmonize and give effect to all parts. (*Ste. Marie v. Riverside County Regional Park & Open-Space Dist.* (2009) 46 Cal.4th 282, 289 [93 Cal.Rptr.3d 369, 206 P.3d 739].)

When the Legislature intends the word "complaint" to include "cross-complaint," it says so. (E.g., Code Civ. Proc., §§ 425.115, subd. (a) ["As used in this section: [¶] (1) 'Complaint' includes a cross-complaint"], 425.16, subd. (h) ["For purposes of this section, 'complaint' includes 'cross-complaint' "], 426.10 ["As used in this article: [¶] (a) 'Complaint' means a complaint or cross-complaint"], 429.30, subd. (a) ["As used in this section: [¶] (1) 'Complaint' includes a cross-complaint"], 430.10 [demurrer or answer may be filed by the "party against whom a complaint or cross-complaint has been filed"], 435, subd. (a) ["As used in this section: [¶]

(1) The term 'complaint' includes a cross-complaint"], 438, subd. (a) ["As used in this section: [¶] (1) 'Complaint' includes a cross-complaint"], 481.060 [" 'Complaint' includes a cross-complaint"], 581, subd. (a) ["As used in this section: [¶] . . . [¶] (2) 'Complaint' means a complaint and a cross-complaint"], 583.110, subd. (b) ["As used in this chapter, unless the provision or context otherwise requires: [¶] . . . [¶] . . . 'Complaint' includes a cross-complaint or other initial pleading"], 1032, subd. (a) ["As used in this section, unless the context clearly requires otherwise: [¶] (1) 'Complaint' includes a cross-complaint"].)

Similarly, the Legislature will expressly say when "plaintiff" includes "cross-complainant" and "defendant" includes "cross-defendant." (E.g., Code Civ. Proc., §§ 386, subd. (c), 389, 425.115, subd. (a), 425.16, subd. (h), 438, subd. (a), 481.180, 581, subd. (a)(4) & (5), 1031, 1032, subd. (a)(2) & (3), 583.110, subds. (d) & (e).)

In *Yao v. Superior Court* (2002) 104 Cal.App.4th 327, 329 [127 Cal.Rptr.2d 912], the Court of Appeal concluded the word "plaintiff" in Code of Civil Procedure section 1030, subdivision (a) does not include a cross-complainant because the statute makes no reference to a cross-complainant. "In sum, the Legislature clearly knows how to indicate when it wants a statutory provision to apply to both a plaintiff and a cross-complainant. It also clearly knows how to indicate that a reference to 'plaintiff' must be construed as including a cross-complainant. The Legislature chose not to adopt either option in this case." (*Yao v. Superior Court, supra,* at p. 332.)

## C.

### *But the Language and Purpose of Corporations Code Section 25501 Establish the Term "the Complaint" Must Mean a Cross-complaint when That Is the Means by Which a Seller Alleges Securities Fraud.*

Those principles are inconclusive, however, in interpreting Corporations Code section 25501. In setting forth the amount of the seller's damages, section 25501 does not say "a complaint" or "complaint" but *"the* complaint" (italics added). To whose complaint does this refer? We must interpret "the complaint" in terms of the context of the statute as a whole, and in that context, "the complaint" must refer to the *seller's* complaint for violations of Corporations Code section 25401; in other words, in calculating damages, the stock is valued as of the time the seller files a pleading alleging the securities fraud claim. We know that because in calculating the amount of the seller's damages, section 25501 considers "the amount of any income *received by the defendant* on the security" (italics added). Thus, the defendant

in section 25501 must be the defendant buyer, who would have received income on the security purchased. Because the buyer is the defendant, the term "the complaint" must refer to the complaint filed by the seller. The term "the complaint" cannot refer, as in this case, to the buyer's complaint because then the phrase "the amount of any income *received by the defendant* on the security" (italics added) would make no sense.

A leading treatise on California securities laws, in explaining a seller's damages under Corporations Code section 25501, also treats the seller as the plaintiff initiating the action and the buyer as the defendant: "In the case of a purchase in violation of these provisions, a plaintiff seller is given a cause of action for damages (when the defendant no longer owns the security) for an amount equal to the difference between (1) the value of the security at the time of the filing of the complaint plus the amount of any income received by the defendant on the security and (2) the price at which the security was sold by the plaintiff plus interest at the legal rate from the date of sale. In such a case, the plaintiff would have been entitled to recover the security itself (and therefore its value at the time of the lawsuit) except for the action of the defendant in disposing of it before the plaintiff brings the action. This action by the defendant, over which the plaintiff had no control, should not result in the plaintiff being entitled to recover less. Therefore, this section provides that the plaintiff may recover the value of the security at the time of the filing of the complaint." (1 Marsh & Volk, Practice Under the Cal. Securities Laws (2010) § 14.03[8][b], p. 14-43 (rel. 38-7/2010).)

Corporations Code section 25501, in setting forth a seller's damages, thus contemplates only the situation in which the *seller* as the *plaintiff* files a *complaint* against the *buyer* as the *defendant* for securities fraud, and does not expressly address the situation in which the seller files a cross-complaint in response to the buyer's complaint. What happens when, as here, the seller files a cross-complaint asserting violations of Corporations Code section 25401?

Interpreting the term "the complaint" in Corporations Code section 25501 to include a seller's cross-complaint for securities fraud is consistent with the purpose for valuing the stock at the time "the complaint" is filed. That purpose is explained as follows: "[I]t was believed that the proper time at which to value the security for the purpose of computing damages when rescission was unavailable was the time the action was commenced. By that action, the plaintiff has indicated his or her election to repudiate the transaction, and future market changes in the price of a security no longer owned by the defendant should not affect the amount of his or her recovery. If it did, then delays in litigation, perhaps beyond the control of either party, would determine to some extent the substantive rights of the parties." (1 Marsh & Volk, Practice Under the Cal. Securities Laws, *supra*, § 14.03[8][b], p. 14-43.)

Ceradyne, the seller in this case, indicated its election to repudiate the transaction when it filed the cross-complaint against the Zalkinds and Quest for securities fraud. Valuing the stock for the purpose of calculating Ceradyne's damages at the time the Zalkinds and Quest filed the complaint would be inconsistent with the purpose of Corporations Code section 25501 because that act did not demonstrate Ceradyne's election to repudiate the transaction.

■ Ceradyne argues that interpreting the term "the complaint" in Corporations Code section 25501 to include a seller's cross-complaint would encourage sellers to "maximize damages by rushing to file a cross-complaint as soon as possible." Section 25501 intends that result by valuing stock for purposes of calculating the seller's damages at the time the seller files the complaint. Section 25501 permits a seller to control the amount of its damages by filing the complaint when the stock price is high. The so-called "perverse incentive[s]" feared by Ceradyne are inherent in section 25501.

■ Ceradyne posits hypothetical situations in which valuing the stock when the seller's cross-complaint is filed would deny the seller damages, while valuing the stock when the buyer's complaint is filed would permit recovery. Of course, hypothetical situations producing opposite results are also possible. Under the undisputed facts of this case, application of Corporations Code section 25501 produces no damages, and that result is consistent with the statutory purpose. "The [Corporate Securities Law of 1968 (Corp. Code, § 25000)] . . . demonstrates a legislative intent to afford victims of securities fraud a remedy without the task of proving common law fraud. Because it has eased the requirements for victims to recover successfully, the Legislature has also imposed certain restrictions on them, such as shortening the statute of limitations for bringing a statutory action and limiting the damages available." (*Boam, supra,* 6 Cal.App.4th at pp. 743–744.)

D.

*The Relation-back Doctrine Does Not Apply to Corporations Code Section 25501.*

■ The cross-complaint does not "relate back" to the date the buyer's complaint was filed for purposes of calculating a seller's damages under Corporations Code section 25501. The code section itself says nothing to suggest it incorporates the relation-back doctrine. The relation-back doctrine has been applied in only two contexts: (1) "to determine the time of commencement of an action for the purpose of the statute of limitations" (*Barrington v. A. H. Robins Co.* (1985) 39 Cal.3d 146, 150 [216 Cal.Rptr. 405, 702 P.2d 563]) and (2) to a statute requiring dismissal of an action for failure to serve a summons within three years of its commencement (*id.* at pp. 152,

157). In the latter situation, the California Supreme Court has concluded the relation-back doctrine applies because the nature and purpose of the statute of limitations and the failure-to-serve statute were "virtually identical" in that both statutes "were designed to move suits expeditiously toward trial." (*Id.* at p. 152.)

The relation-back doctrine does not extend to Corporations Code section 25501 because its nature and purpose are not the same as or similar to those of a statute of limitations. Ceradyne's cross-complaint therefore does not relate back to the date the complaint was filed for purposes of determining damages.

E.

*Ceradyne Failed to Raise a Triable Issue as to Whether the "Price" of the Ceradyne Stock Was Less than the Price Stated in the Asset Purchase Agreement.*

Ceradyne argues the "price" of the stock consideration was less than $2.14 million because the value of Quest's assets had been inflated by the Zalkinds' fraud. As a result, Ceradyne argues, there is a triable issue of material fact as to whether it suffered damages under Corporations Code section 25501.

Undisputed fact No. 1 in the separate statement in support of the Zalkinds and Quest's motion for summary judgment was: "The assets of Quest sold to Ceradyne were valued by Quest and Ceradyne at $2,440,000, as reflected in Exhibit A to the Asset Purchase Agreement . . . . Ceradyne agreed to pay for these assets by giving Stanley Zalkind, Elizabeth Zalkind and Quest . . . $300,000 cash and common stock of Ceradyne valued at $2,140,000." The evidence cited in support of that fact was the declaration of Stanley Zalkind and relevant portions of the Asset Purchase Agreement. Stanley Zalkind's declaration confirmed undisputed fact No. 1. Exhibit A to the Asset Purchase Agreement valued the Quest assets at $2.44 million and confirmed Ceradyne purchased those assets by paying the Zalkinds $300,000 in cash and common stock of Ceradyne valued at $2.14 million. Thus, the Zalkinds established the "price" of the stock consideration was $2,440,000 - $300,000 = $2,140,000.

Ceradyne, in its response to undisputed fact No. 1, stated: "To the extent Ceradyne . . . 'valued' Quest Technology LP's . . . assets at $2,440,000,

Ceradyne's valuation in the A[sset] P[urchase] A[greement] was based upon Stanley Zalkind's false and misleading statements of Quest's business." In support of that assertion, Ceradyne cited the declaration of Ceradyne's chairman of the board and chief executive officer, Joel Moskowitz, who declared: "By 2007, after review of the 2006 calendar year financials of the Quest unit and the significant efforts to make the Quest unit work, it became readily apparent to me that the Quest business that Ceradyne purchased was not the Quest that Mr. Zalkind promised. Furthermore, the molded tooth that Mr. Zalkind touted never materialized. The sales projections, the expansion of the customer base, and entry into untapped markets were so grossly off that there was no possible way Mr. Zalkind's representations in 2004 and the sales projections before the transaction could have been accurate. There simply could not have been any reasonable basis for many of Mr. Zalkind's statements and projections of sales revenue."

Ceradyne argues the Moskowitz declaration "creates a material issue of fact as to the 'price of the security' and affecting the damages calculation under the statutory formula." We disagree. The Moskowitz declaration speaks entirely in generalities. Drawing the inference from the declaration the value of Quest's assets was inflated, the Moskowitz declaration does not state the amount by which the value of those assets was inflated. Even if the Moskowitz declaration raised a triable issue, the issue is not *material* because Ceradyne failed to show the value of the Quest assets was inflated to a degree sufficient to create damages under the required statutory formula. To establish damages, Ceradyne had to show Quest's assets were inflated by at least $826,853, thereby reducing their value from $2,440,000 (the value set forth in the Asset Purchase Agreement) to $1,613,147[11] (the price at which Ceradyne would have incurred damages under the formula in Corp. Code, § 25501).

We conclude Ceradyne failed to produce sufficient evidence in opposition to the Zalkinds and Quest's motion for summary judgment to create a triable issue of material fact as to the price at which the Ceradyne stock was sold.

---

[11] Of the $2.44 million price of the Quest assets, $300,000 was paid in cash and the remainder paid with the stock consideration. We have calculated Ceradyne's damages under the correct interpretation of Corporations Code section 25501 to be negative $526,853 based on a price of $2.14 million for the stock consideration. To eliminate the negative damages, the price of the stock consideration would have to be reduced to $1,613,147 ($2,140,000 minus $526,853). As a consequence, the value of the Quest assets would have to be reduced by $826,853 ($2,440,000 minus $826,853 = $1,613,147).

II.

## CERADYNE CANNOT OBTAIN RESCISSION OF THE ASSET PURCHASE AGREEMENT BECAUSE THE CONSIDERATION CANNOT BE RESTORED.

In granting the Zalkinds and Quest's motion for summary judgment, the trial court concluded Ceradyne could not obtain rescission of the Asset Purchase Agreement because "the parties cannot be returned to the status quo." Ceradyne argues the trial court erred and rescission is permissible because, to the extent the consideration cannot be restored, the court can balance the equities with cash transfers.

To effect a rescission, Civil Code section 1691, subdivision (b) requires the rescinding party to "[r]estore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so." Ceradyne argues the inability to restore the status quo is not a bar to rescission because the Zalkinds and Quest are unable to restore the stock consideration (they sold nearly all of the stock consideration) and because the court has broad powers to fashion relief by "adjusting the equities between the parties." (*Lobdell v. Miller* (1952) 114 Cal.App.2d 328, 344 [250 P.2d 357].)

Ceradyne did not sue for common law fraud: Instead, Ceradyne sued for violation of Corporations Code section 25401, and, therefore, Ceradyne's remedies, both legal and equitable, are limited to those afforded by Corporations Code section 25501. (*Boam, supra,* 6 Cal.App.4th at p. 744.) Section 25501 provides that a person who has suffered from a violation of section 25401 may sue "either for rescission or for damages (*if the plaintiff or the defendant, as the case may be, no longer owns the security*)." (Italics added.) As of April 2005, the Zalkinds had sold 106,500 shares out of 107,095 shares of the stock consideration. Because the Zalkinds no longer owned the security, Ceradyne is limited under section 25501 to recovering damages.

In addition, Corporations Code section 25501 provides that "[u]pon rescission, a seller may recover the security, upon tender of the consideration paid for the security plus interest at the legal rate, less the amount of any income received by the defendant on the security." Ceradyne cannot tender the consideration (the Quest assets) received in exchange for the stock consideration.

All of Quest's operational assets were sold to Ceradyne under the Asset Purchase Agreement. Quest's tangible personal property sold to Ceradyne included machinery, office equipment, product equipment, quality control equipment, furniture, and office supplies. Quest's intangible property included a proprietary process for manufacturing ceramic injection-molded components that could be expanded to include the capability to produce translucent components, such as ceramic orthodontic braces. Quest had been conducting its business at a location in San Diego under a year-to-year lease.

In November 2007, Ceradyne moved what had been Quest's tangible personal property from Quest's former San Diego office to Ceradyne's offices in Costa Mesa. Much of the office equipment and property have since been sold, used up, or given away. Also in November 2007, Ceradyne declined to renew the lease on the former Quest offices in San Diego, and the landlord has entered into a lease with a different tenant. Other personal property leases held by Quest have expired. Former Quest employees, who became Ceradyne employees, taught Ceradyne personnel over a period of several months how to use Quest's proprietary process to form and prepare orthodontic brackets. Quest's inventories of finished goods and work in process are long gone. Of Quest's former employees, one remains employed by Ceradyne, and Ceradyne has terminated the employment of the others.

In summary, Quest has been fully absorbed into Ceradyne; Quest's tangible assets have been sold or dissipated; its office lease has expired; its employees have been dispersed; and its proprietary information has been learned by Ceradyne. Ceradyne cannot tender the consideration and therefore cannot obtain rescission as a remedy under Corporations Code section 25501.

Because none of the parties can restore the consideration for the Asset Purchase Agreement, the rescission sought by Ceradyne is really no rescission. Ceradyne proposes adjusting the equities by balancing the value of the assets purchased by Ceradyne against the value of the Ceradyne shares sold to the Zalkinds and Quest to produce a net balance that can be reduced to a money judgment. Ceradyne alleges the value of Quest's assets was inflated, so the hoped-for result of this adjusting of equities would be a net monetary recovery in Ceradyne's favor in the amount of the difference between the value of the Quest assets purchased and the value of the Ceradyne shares sold to the Zalkinds and Quest. What Ceradyne is seeking by "adjusting the equities" is therefore nothing less than a form of monetary recovery that would be inconsistent with the damages limitations of Corporations Code section 25501.

## DISPOSITION

The judgment is affirmed. Because each party prevailed in part, no party shall recover costs incurred on appeal.

O'Leary, Acting P. J., and Moore, J., concurred.