Filed 11/6/15; pub. order 12/7/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HOT RODS, LLC, | |
| Plaintiff and Respondent, | G049953 |
| v. | (Super. Ct. No. 30-2009-00118853) |
| NORTHROP GRUMMAN SYSTEMS CORPORATION, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Franz E. Miller, Judge. Affirmed in part and reversed in part, remanded.

Lewis Brisbois Bisgaard & Smith, R. Gaylord Smith, Ernest Slome and Brittany H. Bartold for Defendant and Appellant.

Palmieri, Tyler, Wiener, Wilhelm & Waldron, Patrick A. Hennessey, Michael I. Kehoe and Erica M. Sorosky for Plaintiff and Respondent.

\*          \*          \*

Defendant and appellant Northrop Grumman Systems Corporation (Northrop) appeals from a judgment of approximately $1.1 million plus interest, costs, and attorney fees of approximately $1.8 million in favor of plaintiff and respondent Hot Rods, LLC (Hot Rods). This case involves an environmentally compromised property Hot Rods purchased from Northrop and the alleged damages stemming from environmental cleanup and related issues. The matter was tried by a referee pursuant to stipulation, and judgment was entered by the trial court, adopting the referee's recommendations. Northrop alleges numerous errors.

First, Northrop argues that based on contractual language stating "no extrinsic evidence whatsoever may be introduced" in any case involving the agreement, the referee erred by admitting such evidence. We agree. Based on the plain language of the agreement, no extrinsic evidence should have been admitted to interpret the document.

Northrop further claims the referee misinterpreted an environmental indemnity provision to include both first and third party claims. We find that taken as a whole, the provision is broad enough to encompass both first and third party claims. Accordingly, a declaratory judgment finding Northrop liable for such claims is valid and shall be upheld.

Next, for several reasons, Northrop argues the $1 million the referee awarded to Hot Rods for loss of use of the property was improper. We concur that this award was erroneous because there was not sufficient evidence to support the amount of the award, and, accordingly we reverse it. With the $1 million award stricken, this leaves Hot Rods with a monetary award of $117,050.

There also is language in the referee's statement of decision indicating Northrop had negligently misrepresented certain facts, but did not find any damages were proximately caused, nor did the referee award any damages on that cause of action. We

2

conclude any finding of negligent misrepresentation is therefore improper, and not sufficiently supported by substantial evidence in any event.

Finally, because we are reversing the bulk of the damages award, we must remand the case for a reconsideration of which, if either, is the prevailing party, and therefore entitled to attorney fees.


I

FACTS

This is a complicated case with a long history. In the interest of avoiding an exceedingly long opinion, we shall provide an overview of the background while focusing our attention on the facts pertinent to the issues on appeal. Likewise, we have omitted references to procedural matters that do not impact the instant appeal.


*Background*

For many years, Northrop operated the property at 301 East Orangethorpe Avenue in Anaheim (the property) for the purpose of manufacturing floor beams for Boeing 747 aircraft. The facility was closed in the mid-1990's, and in 1994, Northrop retained Canonie Environmental (Canonie), a consultant, to conduct what was referred to as a "Phase I Environmental Assessment" (Phase I assessment) of the property. The Phase I assessment "is a qualitative assessment of process and accumulation areas throughout the . . . facility that may chemically affect soil beneath the property." Canonie identified 15 areas of potential concern and recommended further investigation.

Northrop then retained Smith Environmental Technologies (Smith) to conduct a further investigation (the Smith Report). The investigation, conducted in 1994, included 43 borings drilled and sampled at various locations. Smith also excavated and removed soil containing certain chemicals, including trichloroethene (TCE). Smith concluded the chemicals found did not pose a significant threat to groundwater, and the

3

property was not a source of groundwater contamination. This conclusion was based on the property's location in a "regional groundwater plume" of contamination, and data showing the concentrations of TCE up gradient were higher than those down gradient from the property. The Smith Report recommended no further action or remediation despite the existing contamination at the property with respect to either soil or groundwater.

Northrop requested closure of the site from the Regional Water Quality Control Board (the Board) in 1995. The Board requested a work plan to address additional groundwater monitoring wells and quarterly water sampling. With respect to the soil, the Board indicated that contamination did not exist in concentrations that would require further cleanup at the time. If, however, information became available in the future that significant concentrations of contaminants existed, the Board might take further remedial action.

At meeting with the Board, Dr. Jim Babcock, Northrop's consultant and principal author of the Smith Report, expressed disagreement with the Board's water sampling requirements. Eventually the Board agreed that a method of sampling other than wells could be used instead to determine if additional investigation was required. Samples taken in the fall of 1995 revealed high concentrations of TCE in groundwater at two locations.

Northrop's consultant continued to believe that remediation was unnecessary because the data did not indicate the property itself was the source of the contamination, for a number of technical reasons, including the sampling method that was used. Monitoring wells installed later indicated lower levels of TCE which were more consistent with concentrations from up-gradient areas. Babcock conceded, however, that remediation might be necessary.

4

*Purchase and Sale Agreement*

While this series of tests and discussions with the Board was ongoing, in mid-1995, Northrop began negotiations with Dan Welden to sell the property. Northrop's practice at the time was not to consider the sale of a property until soil remediation was completed. A property with groundwater issues or potential issues could be sold, because groundwater treatment could proceed without interfering with a new owner's operations.

For Welden, who was looking for a new location for his auto parts reselling business, buying a property with unremediated contamination was a nonstarter. He did not want to be responsible for any cleanup costs.

On December 1, 1995, Northrop executed a purchase and sale agreement (the agreement) for the 9.5 acre property, selling the property to Welden and his wife, Kathy J. Welden, for $3.5 million. According to the parties, at some point, the Weldens assigned their rights to Hot Rods, an LLC owned entirely by the Weldens. The agreement includes numerous provisions which are pertinent here.

In section 3.3.1, the agreement states: "Seller has provided to Buyer . . . Due Diligence Materials for review and acceptance. . . . [¶] Subject to the provisions of Section 16, Buyer acknowledges and agrees that Seller has not made and does not make . . . any representations or warranties regarding the compliance of the Real Property and Improvements with Environmental Law. To the best of Seller's information and belief . . . (i) there are no underground storage tanks located in or under the Real Property; (ii) there are no Hazardous Materials Conditions, in, on, or under the Real Property or Improvements caused by Seller; and (iii) there has been no Release or presence of Hazardous Materials in, on, or under the Real Property or Improvements including the soil or groundwater that requires Remediation under applicable Environmental Law as of the Closing."

5

The term "[t]o the best of Seller's information and belief" was defined elsewhere in the agreement as meaning "information actually known to Seller."

The due diligence materials referred to in paragraph 3.3.1 included Canonie's Phase I assessment, the summary of the Smith Report, correspondence between the Board and Northrop, and various other documents. The agreement itself disclosed the groundwater condition pursuant to Health and Safety Code section 25359.7. It also stated the Board had decided no further action was required with respect to soil remediation, but further action might be required to monitor the groundwater. A work plan submitted to the Board for the installation of groundwater monitoring wells was among the due diligence materials.

Section 16.2 addressed environmental indemnity. It stated: "With respect to the Seller's ownership and/or operation of the Real Property including the acts or omissions of Seller's employees, agents or contractors before or after the Closing, Seller hereby agrees to indemnify, defend by legal counsel selected and retained by Seller, and reasonably approved by Buyer, and hold the Buyer and Buyer's lenders . . . harmless from and against any claims, demands, penalties, fees, fines, liability, damages, costs, losses, or other expenses including, without limitation, reasonable environmental consulting fees and reasonable attorney fees arising out of (a) any Environmental Action(s) and/or Remediation involving an environmental condition or liability involving the Real Property caused by an act or omission of Seller and its employees, agents and contractors before or after the Closing; (b) any personal injury (including wrongful death) or property damage (real or personal) arising out of Hazardous Materials used, handled, generated, transported, disposed, or released by Seller and its employees, agents and contractors at the Real Property before or after the Closing. This Environmental Indemnity is in addition to any rights or remedies of Buyer and Seller under section 3.3."

The agreement stated in section 17.16 that it was to "be construed to effectuate the normal and reasonable expectations of a sophisticated Seller and Buyer."

6

The parties also agreed that any dispute would be resolved by the reference procedures described in Code of Civil Procedure section 638, et seq.

Finally, the agreement included the following integration clause: "This Agreement contains the entire understanding between the Parties and supersedes any prior understandings or written or oral agreements between them regarding representations, agreements, arrangements or understandings, oral or written, between the parties hereto relating to the subject matter of this Agreement which are not fully expressed in this Agreement. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial proceedings involving this Agreement."

We shall discuss other provisions of the agreement below as it becomes necessary.

*Remediation Following Sale*

In November 1996, Hot Rods' attorney informed Northrop that an underground storage tank had been discovered on the property. The letter demanded Northrop "comply with its environmental indemnification obligations" and address the matter. Northrop informed Hot Rods it would remove the tank. Northrop also reimbursed approximately 30 different environmentally related expenses between 1995 and 2008.

Meanwhile, in November 2003, the Board issued a Cleanup and Abatement Order directing Northrop to remediate the groundwater at the property. Northrop developed a plan, which the Board approved. In 2007 and 2008, additional testing revealed substantial soil contamination. The remediation plan was updated and implemented. Part of the property has since been fully remediated, and work was ongoing to complete remediation. According to Welden, he was subject to substantial inconvenience as a result of the remediation procedures, including the presence of wells,

7

odors, parking spots taken up with equipment, blocked access, pollution generated by equipment, and similar matters. Damage to the building also occurred and evacuation for several days was required at one point.

As noted above, Northrop had regularly reimbursed Hot Rods for remediation related expenses. Starting in 2008, Northrop began stating it was willing to pay for some, but not all, costs under a "reservation of rights." According to Northrop, the dispute that finally triggered this lawsuit was a dispute over a claim for loss of rental payments. Hot Rods asserted its tenant, The Rock Church, had delayed entry into a lease for the property due to the remediation activities. Northrop disagreed with Hot Rods that it was responsible for this claim.

*The Instant Case*

In April 2009, Hot Rods filed its initial complaint, and in June 2011, an amendment thereto. The complaint alleged causes of action for breach of contract, fraud, negligent misrepresentation, private nuisance, public nuisance, trespass to land, unfair business practice, and declaratory relief. The amendment to the complaint added newly numbered causes of action for breach of contract, trespass, negligent misrepresentation, fraud, declaratory relief, and injunctive relief. Northrop eventually answered and denied the allegations of both the complaint and the amended complaint. The parties stipulated to a referee pursuant to the agreement.

*Trial and Decision*

Prior to trial, Northrop filed a motion in limine to exclude extrinsic evidence regarding the meaning of the agreement, pursuant to the integration clause. The referee denied the motion. Thus, at trial, Hot Rods introduced extensive testimony regarding preliminary negotiations, draft provisions, and evidence of the parties' conduct after the agreement was executed.

8

At the conclusion of trial, the referee issued a tentative statement of decision awarding Hot Rods $1,116,450, comprising $1,000,000 in damages for impairing the use of the property, lost rent of $105,000,[1] $10,000 it spent on an air study, and $1,450.00 for electricity and water used on the site. Hot Rods was also entitled to its costs and reasonable attorney fees. After briefing, the referee supplemented the statement of decision by adding an attorney fees award of $1,841,204 and costs of $250,092, as well as interest at the rate of $334.21 per day. The total damage award, accordingly, was $3,311,169.

In January 2014, the court entered judgment pursuant to the referee's statement of decision. Northrop's subsequent objections to the statement of decision and request for a new trial were summarily denied. Northrop appeals.

II

DISCUSSION

*Admissibility of Extrinsic Evidence*

We address this issue first, although neither of the parties did, because it presents a threshold question directly impacting the other issues in this case. Northrop argues the referee should not have considered extrinsic evidence in interpreting the meaning of the agreement, and we agree this was error.

As noted above, the agreement included an integration clause that included the following language: "The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial proceedings involving this Agreement."

"Under the parol evidence rule, when a contract is integrated (as this one is under Art[icle] 46), extrinsic evidence cannot be used to vary or contradict the

---

[1] This was revised to $105,600 in the final statement of decision.

9

instrument's express terms. [Citations.] This rule is based on sound logic and policy; when a contract is reduced to writing, it is presumed to contain all of the material terms, and it cannot reasonably be presumed that the parties would intend two contradictory terms to be part of the same agreement. [Citation.]" (*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1061 (*Thrifty*).)

Ordinarily, even in an integrated contract, extrinsic evidence can be admitted to explain the meaning of the contractual language at issue, although it cannot be used to contradict it or offer an inconsistent meaning. The language, in such a case, must be "'reasonably susceptible'" to the proposed meaning. (*Thrifty, supra,* 185 Cal.App.4th at p. 1061.) But by attempting to introduce any extrinsic evidence here, Hot Rods is trying to do an end run around the integration clause itself. The sentence "no extrinsic evidence whatsoever may be introduced in any judicial proceedings involving this Agreement" permits no other interpretation. The expressed intent of the parties was to bypass the general rule that consistent extrinsic evidence is admissible to explain the meaning of a contractual provision. Contracts must mean what they say, or the entire exercise of negotiating and executing them defeats the purpose of contract law – predictability and stability. (*Thrifty, supra,* 185 Cal.App.4th at pp. 1061, 1064 [provision stating a contract may be terminated for "any reason" means "any reason"].)

Hot Rods argues the provision should not be enforced because doing so would contradict public policy. While the parol evidence rule is a provision of substantive law, rather than a question of evidence or procedure, it does not follow, as Hot Rods argues, that the parties cannot give up their right to seek its admission. The case Hot Rods cites, *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, does not stand for the proposition that such a clause is inherently unenforceable.

Moreover, "'"It has been well said that public policy is an unruly horse, astride of which you are carried into unknown and uncertain paths. . . . While contracts opposed to morality or law should not be allowed to show themselves in courts of justice,

10

yet public policy requires and encourages the making of contracts by competent parties upon all valid and lawful considerations, and courts so recognizing have allowed parties the widest latitude in this regard; and, unless it is entirely plain that a contract is violative of sound public policy, a court will never so declare.""" (*Bovard v. American Horse Enterprises, Inc.* (1988) 201 Cal.App.3d 832, 838-839.) Hot Rods cannot clear this high bar. This contract only governs the relationship between Hot Rods and Northrop, and has no implications for public policy.

Indeed, in the context of an arbitration agreement, a similar clause has previously been upheld. In *Bonshire v. Thompson* (1997) 52 Cal.App.4th 803, a contract for binding arbitration included language that the language of the contract "'may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. The parties further intend that this agreement constitutes the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial or arbitration proceeding, if any, involving this agreement.'" (*Id.* at p. 806; italics omitted.) The court found it was error for the arbitrator to use extrinsic evidence, finding he exceeded his powers. (*Id.* at pp. 810-811.) While we agree with Hot Rods that the context is different, we see no reason why such a provision would be fully enforceable in an arbitration setting yet completely unenforceable as against public policy in a reference under Code of Civil Procedure section 638.

Hot Rods also argues the parties did not have equal bargaining strength and were not on equal footing because Northrop was a global aerospace company and had superior knowledge about the condition of the property. If that were true, the seller would *always* have superior bargaining strength. This, obviously, is not the law. The idea behind equal bargaining strength is the ability to bargain for fair terms rather than being forced to accede to unacceptable ones. There is nothing in the evidence in this case that even suggests Hot Rods (or the Weldens) were forced to accede to anything. Both

11

parties were represented by counsel and there is no indication Hot Rods was not willing to walk away from the deal if acceptable terms could not be reached.

As stated in section 17.16, this contract was entered into under "the normal and reasonable expectations of a sophisticated Seller and Buyer." Surely those expectations must include the premise that completely unambiguous contractual language would be enforced. The parties decided "that no extrinsic evidence whatsoever" would be admissible, and we presume they did so deliberately and meaningfully. The referee, therefore, erred by admitting extrinsic evidence to interpret the contract, and accordingly, we decline to consider any extrinsic evidence in conjunction with the remaining issues on appeal.

*Environmental Indemnity Provision & Declaratory Judgment*

As noted above, the agreement included paragraph 16.2, which stated: "With respect to the Seller's ownership and/or operation of the Real Property including the acts or omissions of Seller's employees, agents, or contractors before or after the Closing, Seller hereby agrees to indemnify, defend by legal counsel selected and retained by Seller, and reasonably approved by Buyer, and hold the Buyer and Buyer's lenders . . . harmless from and against any claims, demands, penalties, fees, fines, liability, damages, costs, losses, or other expenses including, without limitation, reasonable environmental consulting fees and reasonable attorney fees arising out of (a) any Environmental Action(s) and/or Remediation involving an environmental condition or liability involving the Real Property caused by an act or omission of Seller and its employees, agents and contractors before or after the Closing; (b) any personal injury (including wrongful death) or property damage (real or personal) arising out of Hazardous Materials used, handled, generated, transported, disposed, or released by Seller and its employees, agents and contractors at the Real Property before or after the Closing. This Environmental

12

Indemnity is in addition to any rights or remedies of Buyer and Seller under section 3.3."[2]

Northrup argued during trial, and continues to do so here, that the indemnity provision applied only to third party claims and does not permit Hot Rods to sue for its own damages. The referee concluded: "This is a reasonable argument in most indemnity actions but it does not apply here. Paragraph 16.2 is much broader than third party claims. This conclusion is supported by the text of the paragraph. . . . The consistent course of conduct during the negotiations and during the initial claims demonstrates that both sides interpreted the [agreement] to include damages or losses sustained by Hot Rods due to environmental contamination."

"'[I]nterpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence.'" (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 520.) "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636;[3] *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (§ 1638.) "Where contract language is clear and explicit and does

---

[2] "Environmental Action" was defined to mean "any complaint, summons, citation, notice of violation, notice of potential liability, agency request, directive, order, claim, litigation, investigation, proceeding, judgment, letter or other communication from any governmental agency involving Hazardous Materials Conditions, violations of Environmental Laws, or Releases at or from the Real Property for which Seller is or may be liable under applicable Environmental Laws." "Remedial Work" was defined as "all remedial work performed or to be performed to investigate, characterize and remove, contain, dispose, treat, or otherwise deal with Hazardous Materials Conditions and Releases in, on, from, or under the Real Property in order to render the Real Property in compliance with applicable Environmental Laws."

[3] All further statutory references are to the Civil Code.

13

not lead to absurd results, we ascertain intent from the written terms and go no further." (*Ticor Title Ins. Co. v. Employers Ins. of Wausau* (1995) 40 Cal.App.4th 1699, 1707.) Here, we can go no further pursuant to the integration clause, which prohibits the introduction of extrinsic evidence. We therefore interpret the clause based on the language of the agreement alone.

Section 2772 defines "indemnity" as "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." This provision "plainly states that indemnity may apply to either direct or third party claims." (*Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 556, fn.5 (*Dream Theater*).)

Indemnity provisions typically refer to third party claims, but if the parties so intend, such provisions may also encompass direct claims. *Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1023 (*Zalkind*), addressed this issue at length: "The terms 'indemnify' and 'indemnity' have been defined in several ways. 'Indemnity may be defined as the obligation resting on one party to make good a loss or damage another party has incurred.' [Citation.]" (*Ibid.*)

"Although indemnity generally relates to third party claims, 'this general rule does not apply if the parties to a contract use the term 'indemnity' to include direct liability as well as third party liability.' [Citation.] '[E]ach indemnity agreement is "interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract."' [Citation.] When indemnity is expressly provided by contract, the extent of the duty to indemnify must be determined from the contract itself. [Citations.]" (*Zalkind, supra,* 194 Cal.App.4th at p. 1024.)

"'[T]he question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the

14

circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts.' [Citation.] The indemnity provisions of a contract are to be construed under the same rules for interpreting contracts, "'with a view to determining the actual intent of the parties.'" [Citations.]" (*Zalkind, supra,* 194 Cal.App.4th at pp. 1024-1025.) Thus, while Northrup argues there must be "express language" in an indemnity clause before it is interpreted to encompass first party claims, we disagree. It is the intent of the provision, and the agreement as a whole, that governs.

The contract in *Zalkind* stated the "'Buyer shall indemnify, hold harmless and defend the Selling Parties . . . from and against any and all Damages that arise from or are in connection with: [¶] . . . [¶] . . . Any breach or default by the Buyer of its covenants or agreements contained in this Agreement.'" (*Zalkind, supra,* 194 Cal.App.4th at p. 1022.) The contract defined "Damages" as "'(i) demands, claims, actions, suits, investigations and legal or other proceedings brought against any indemnified party. . . and (ii) all liabilities, damages, losses, . . . costs and expenses (including . . . reasonable attorneys'. . . fees . . . ) incurred by any indemnified party.'" (*Id.* at p. 1023, italics omitted.)

We determined the provision was "broadly worded" and "does not limit indemnification to third party claims and extends indemnification to 'any and all' damages incurred by [plaintiffs] arising out of [defendant's] breach of the Asset Purchase Agreement. Read in . . . context of . . . the word 'indemnify' makes better sense when read to mean 'make good,' 'reimburse,' or 'compensate.'" (*Zalkind, supra,* 194 Cal.App.4th at p. 1027.) The court also concluded that other parts of the contract, when read together, supported a broad interpretation of the indemnification provision. (*Id.* at pp. 1027-1029.)

In *Dream Theater, Inc., supra,* 124 Cal.App.4th 547, an indemnity provision in an asset purchase agreement for an Internet-based multimedia and entertainment business provided that "[the] [s]ellers agreed to indemnify buyer Dream

15

Theater, LLC against (a) any breach by Sellers of any representations or warranties made in the Contract; (b) any breach of any covenant in the Contract or ancillary documents; and (c) all liabilities except those buyer assumed.  Buyer Dream Theater, LLC agreed to indemnify seller Dream Theater, Inc. against (a) any breach by buyer of any representations or warranties made in the Contract; (b) any breach of any covenant in the Contract or ancillary documents; and (c) all liabilities buyer assumed." (*Id.* at p. 554.)

An arbitration clause was located in the same portion of the contract as the clause addressing indemnification.  The party seeking to avoid arbitration argued it applied only to third party claims.  But the court determined the language was sufficiently broad to encompass direct claims, reasoning the contract clearly required both parties to indemnify the other for their own wrongdoing. (*Dream Theater, Inc., supra,* 124 Cal.App.4th at p. 555.)

In *Wilshire-Doheny Associates, Ltd. v. Shapiro* (2000) 83 Cal.App.4th 1380, 1396 (*Wilshire-Doheny* ), two contractual indemnity provisions were at issue, executed by a corporation on behalf of two employees, an attorney and a real estate broker.  The first provision applied to both employees, and stated the corporation "'agrees to indemnify and hold the Indemnitees and their assigns, successors, heirs, and personal representatives harmless against any and all claims, suits, demand, actions, causes of actions [*sic*], damages, set-offs, liens, attachments, debts, expenses, judgments, or other liabilities of whatsoever kind or nature arising out of or related to the actions taken by the Indemnitees on behalf of [the indemnitor] and its affiliates. . . .  This indemnification shall include reasonable attorneys fees and costs.'" (*Id.* at p. 1387.)

The second provision was in a contract executed when the attorney later became a corporate officer. (*Wilshire-Doheny, supra,* 83 Cal.App.4th at pp. 1387, 1394-1395.)  The language in that clause stated the corporation "'hereby indemnifies and holds [the attorney] harmless from any and all claims, actions and liabilities brought against him with respect to his [corporate] capacity . . . or any actions he takes in good faith on

16

behalf of the Corporation. This indemnity shall include the cost of reasonable attorneys fees and related expenses.'" (*Id.* at p. 1395.)

The two employees later became involved in litigation with the corporation and won. (*Wilshire-Doheny, supra,* 83 Cal.App.4th at pp. 1385-1387.) Based in part on the two indemnity clauses, they moved for attorney fees and costs. The trial court concluded the clauses were not broad enough to cover attorney fees, but the appellate court disagreed, stating: "[t]here is nothing in the language of any of the [two] indemnity provisions specifically limiting their application to third party lawsuits. [The corporate indemnitor] point[s] to no extrinsic evidence introduced to demonstrate that the parties intended these provisions to apply to third party lawsuits only. [Citations.] Thus, it has not been shown the indemnity provisions are inapplicable merely because appellants seek indemnification for attorney's fees and costs incurred in an action brought by the indemnitor . . . ." (*Id.* at p. 1396.)

The language of the provision itself at issue here is quite broad. It purports to indemnify Hot Rods from "*any claims*, demands, penalties, fees, fines, liability, damages, costs, losses, or other expenses including, without limitation, reasonable environmental consulting fees and reasonable attorney fees." (Italics added.) In section 1.13, "Claim" is defined[4] as "any claim or demand by any Person for any alleged liabilities, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, Permit, ordinance, regulation, common law, equity or otherwise." Section 1.14 defines "Person" as "any person, employee, individual, corporation, unincorporated association, partnership, trust, federal, state or local governmental agency, authority or other private or public entity." Thus, the parties expressly adopted a broad definition of "claim" and "person" that encompasses "any alleged liabilities," and covers both first and third party claims.

_____

[4] While the word "claim" in section 16.2 is not capitalized, it is nonetheless a defined term in the agreement and we interpret it accordingly.

17

Moreover, if the language was meant only to cover third party claims, there seems little point in including the phrase "damages, costs, losses" when those would all have been covered already. That language seems entirely duplicative of "any claims, demands, penalties, fees, fines, liability," if the provision is intended to apply only to third party claims. As Northrup points out, we try to interpret contracts to avoid surplusage. (*Appalachian Ins. Co. v. McDonnell Douglas Corp.* (1989) 214 Cal.App.3d 1, 12.) The extremely broad language here, such as "any claims, . . . damages, costs, losses" does not suggest the parties intended to limit the provision to third party claims.

The provision here also states it covers two categories of claims. The first are "Environmental Action(s) and/or Remediation," and the second are "any personal injury (including wrongful death) or property damage (real or personal) arising out of Hazardous Materials used" at the property either before or after the closing. Again, there is no language expressly limiting either category to third party claims. (See *Wilshire-Doheny, supra,* 83 Cal.App.4th at p. 1396.)

When read with the rest of the contract, our conclusion that the indemnity provision applies to both first and third party claims is strengthened. Section 16.4 required Hot Rods to promptly give Northrup notice of any "Environmental Action." Northrup also retained the right to contest or defend against any such action. Interestingly, however, this did not extend to the second category of claims covered by section 16.2, personal injury or property damage. If the indemnity provision applied only to third party claims, as Northrup contends, one wonders why Northrup would not require prompt notice of, say, a wrongful death lawsuit, and, more importantly, why Northrup would not want to retain the right to settle or defend the claim. The reasonable inference is that the second type of claim was not intended to be limited to third party claims, but contemplated claims from Hot Rods as well.

It is also clear from the entirety of the contract that the environmental condition of the property was a primary concern of Hot Rods. The agreement itself

18

incorporated by reference a long list of environmental due diligence materials and representations from Northrup regarding environmental conditions on the property. Hot Rods was given time under the agreement to perform an inspection or investigation of environmental conditions. The reasonable inference was that Hot Rods wanted to make certain that it would not be responsible for covering the costs of environmental problems or cleanup, either directly or indirectly, and that Northrup was willing to so guarantee. Thus, interpreting the indemnity clause to cover both first and third party claims is consistent with the overall intent of the agreement.

Accordingly, the declaratory judgment, which finds Northrop liable for first and third party claims as contemplated by the agreement, is affirmed. We shall discuss the monetary damage award below.


*Damages for Loss of Use*

In the section of its closing brief, before the reference called "Damages," Hot Rods raised three arguments. First, it argued it had suffered "a diminution in value arising from the indemnified events entitling Hot Rods to recovery" under the indemnity clause in the agreement. This section of the brief extensively reviewed the testimony of Hot Rods' own expert, Stephen Roach, on the issue of whether environmental contamination had caused a diminution in the property's value. The brief also endeavored to refute the testimony of Northrop's expert, Steve Norris, on this topic. Hot Rods argued a 25 percent diminution, amounting to $5.5 million, had resulted from Northrop's acts. In its second argument, Hot Rods indicated other expenses it believed Northrop should pay, including $105,600 from lost rent from the church, the $10,000 air study, and similar miscellaneous expenses. In its final argument, Hot Rods argued Northrop should be entitled to consequential, out-of-pocket, and additional damages as a result of Northrop's fraudulent or negligent misrepresentations, requesting a minimum award of approximately $1.9 million, plus punitive damages.

19

In the statement of decision, the referee stated: "In its Closing Brief Hot Rods presents several claims for damages. First it seeks recovery for 'diminution in value [of the property] arising from the indemnified events. . . .' Hot Rods contends the intensive remediation activity on the property has depressed its value by 25% of its current assumed value of $22,000,000 or $5,500,000. Northrop's appraiser did not seem to grasp the valuation issue and was substantially impeached on cross-examination. Nevertheless Hot Rods' evidence of value is subject to criticism. There is no doubt that the intensive remediation activity diminished the value of the property, especially when the . . . remediation systems were being installed. But the property continued to be used and was not sold. Now in 2013 Hot Rods still owns the site and it seems likely that the remediation will eventually be completed and the property restored to its full fair market value."

The statement of decision continues: "In addition the property has been improved by Hot Rods and, once remediation is completed, it will be better than it was at the time of sale. Even if groundwater monitoring wells are required on the perimeter . . . the diminished value will not be 25%. Hot Rods cannot be allowed to choose the period of intensive remediation as a date of value and ignore that the property will soon be fully remediated. The best approach is to assume that the remediation activities caused a temporary damage similar to the damage to property subject to eminent domain when there is a temporary construction easement. Hot Rods attempt to relate the value to the price for the property in 1995 is rejected. It is too remote in time. [¶] . . . [¶] Obviously the remediation activity has impaired the use of the property. The impairment is a long-lasting but eventually ending inconvenience and, under Paragraph 16, Hot Rods is entitled to damages for the period through the date of this award of $1 [million]."

The statement of decision then goes on to award Hot Rods the $105,600 in lost rent from the church, the $10,000 costs of the air study, and $1,450 for utilities used by Northrop on the site. The damages section of the statement of decision makes no

20

mention of the negligent misrepresentation cause of action, except to deny Hot Rods' request for punitive damages.

Northrop raises several arguments as to why the $1 million award for loss of use was improper, but we focus our attention on one issue – even if we assume there was sufficient evidence to support damages for loss of use, the amount of damages the referee awarded was not reasonably related to the evidence.

We review an award of damages in a breach of contact case for substantial evidence. (*SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 563.) "'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.]'" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 774.) But "the court use[d] some reasonable basis of computation." (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 402.)

There was a dearth of testimony in this case regarding damages for loss of use, probably because Hot Rods had chosen to focus its case on diminution in value. Hot Rods' expert testified the property's "income is the same in the affected condition as it was in the baseline condition. . . . The operating expenses are the same, so the net income is the same." There was no testimony at all regarding an appropriate damage award strictly for loss of use.

Hot Rods argues "the $1 million damage award falls within the range of the expert opinions given at trial." (Italics omitted.) Indeed it does, but those experts were testifying about something else. The testimony Hot Rods quotes refers specifically to diminution in value. Hot Rods cannot simply pretend that diminution in value and loss of use are the same thing. They are obviously not, and the referee went out of the way to

21

distinguish them.  Evidence introduced to prove the plaintiff lost an apple cannot be used to justify an award of an orange.

Thus, even if we make the rather great leap to find there is substantial evidence to uphold *any* award for loss of use, there is no evidence to support the $1 million amount the referee chose.  We cannot conclude a "reasonable basis of computation" was used when Hot Rods cannot point to any evidence at all to support that number.  We cannot even say it is a fair approximation.  It lacks the support of substantial evidence, and accordingly, it must be reversed.  The only monetary damages that survive are $105,600 for loss of rental income, $10,000 for the air study, and $1,450 for utilities, for a total award of  $117,050.

*Negligent Misrepresentation*

This cause of action is perplexing.  There is some language in the statement of decision indicating Northrop did not commit fraud, but negligently represented certain facts.  We are uncertain if the referee was reaching a conclusion as to the negligent misrepresentation cause of action, as the statement of decision does not so specify, but we assume for the sake of argument that was the referee's intent.  The statement of decision does not state that any damages resulted or include *any* award of damages on this cause of action, even nominal damages of $1.

The elements of negligent misrepresentation are:  (1) the defendant made a false representation as to a past or present material fact; (2) the defendant made the representation without reasonable ground for believing it to be true; (3) the defendant intended to deceive the plaintiff by making the representation; "(4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered resulting damages."  (*West v. JPMorgan Chase Bank, NA* (2013) 214 Cal.App.4th 780, 792.)

22

Accordingly, we must conclude that any finding of negligent misrepresentation is erroneous and must be reversed, as the statement of decision does not reflect that all of the elements of the tort, specifically, damages, are present.

*Attorney Fees*

Because we are reversing the judgment in part, including the bulk of the damage award, the attorney fees award must be reversed as well. We remand for consideration anew of the prevailing party determination and the amount of any attorney fee award. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876; see also *Deane Gardenhome Assn. v. Denktas* (1993) 13 Cal.App.4th 1394 [in some cases, a determination of no prevailing party is appropriate].)

## III

## DISPOSITION

The judgment is affirmed in part and reversed in part. The declaratory relief judgment is affirmed. The damages award is reduced to $117,050.

The case is remanded for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.

23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HOT RODS, LLC, | |
| Plaintiff and Respondent, | G049953 |
| v. | (Super. Ct. No. 30-2009-00118853) |
| NORTHROP GRUMMAN SYSTEMS CORPORATION, | ORDER GRANTING REQUEST FOR PUBLICATION; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

Berding & Weil LLP and Paul W. Windust have requested that our opinion, filed on November 6, 2015, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.