Filed 1/25/24  Hot Rods v. Northrop Grumman Systems Corp. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HOT RODS, LLC,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>NORTHROP GRUMMAN SYSTEMS CORPORATION,<br><br>Defendant and Appellant. | G062150<br><br>(Super. Ct. No. 30-2009-00118853)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Ann L. Kough, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Reversed.

Lewis Brisbois Bisgaard & Smith, R. Gaylord Smith, Ernest Slome and James A. Geocaris for Defendant and Appellant.

Horvitz & Levy, David M. Axelrad, John B. Sprangers, Jeremy B. Rosen; Jackson Tidus, A Law Corporation, Michael L. Tidus and Kathryn M. Casey for Plaintiff and Respondent.

\*          \*          \*

In 1995, the predecessors in interest of plaintiff Hot Rods, LLC (Hot Rods) purchased environmentally compromised property from defendant Northrop Grumman Systems Corporation (Northrop). The Purchase and Sale Agreement (PSA) obligated Northrop to, among other things, remediate the property and indemnify Hot Rods against first and third party claims. The parties have been litigating the extent of those obligations since 2009, and those disputes were heard by a referee.

In the latest chapter of the long-running saga, Hot Rods sought an order requiring Northrop to pay for Hot Rods' alleged loss of use of the property due to remediation activities. The referee issued a statement of decision ordering Northrop to pay approximately $1.4 million in back rent and $32,000 a month in rent going forward until remediation is complete. The trial court confirmed that order, which Northrop now challenges.

We conclude the referee and the court erred. The PSA provides Northrop with the right to conduct remediation activities without the payment of rent. The evidence Hot Rods submitted was based on a square foot valuation that was untethered to any actual damages or losses, the only type of compensation to which Hot Rods is entitled. Accordingly, we reverse the postjudgment order.

I

FACTS

*Prior Appeals*

We have seen this case on numerous prior occasions. The first time, we affirmed the denial of Northrop's anti-SLAPP motion. (*Hot Rods, LLC v. Northrop Grumman Systems Corporation* (Mar. 8, 2012, G044976) [nonpub. opn.]).) In 2015, we considered Northrop's appeal after judgment. (*Hot Rods, LLC v. Northrop Grumman Systems Corp.* (2015) 242 Cal.App.4th 1166 (*Hot Rods II*).) The underlying facts are set forth in that opinion. In 2018, we affirmed judgment after remand in favor of Hot Rods.

2

(*Hot Rods, LLC v. Northrop Grumman Systems Corporation* (Dec. 5, 2018, G054432) [nonpub. opn.] (*Hot Rods III*).)  Additional appeals are pending, including one that is stayed pending the outcome of this case and the companion case to this appeal, case No. G061449.

As we mentioned previously:  Simply put, this case involves environmental contamination of a property in Anaheim that was sold by Northrop to Dan and Kathy Welden, who assigned their interest to Hot Rods, an LLC owned entirely by the Weldens. (*Hot Rods II*, *supra*, 242 Cal.App.4th at p. 1172.)  The trial court, pursuant to a referee's recommendation, originally awarded Hot Rods $1,116,450 in damages plus $2,091,130 in attorney fees and costs.  (*Id.* at pp. 1174-1175.)  The court also granted Hot Rods' request for declaratory relief, finding an indemnity clause in the relevant contract covered both first and third party claims.  (*Id.* at p. 1182.)

This court affirmed in part and reversed in part.  For a number of reasons, we reversed the bulk of the damage award.  The Purchase and Sale Agreement (PSA) between the parties included a sentence in its integration clause stating:  "'The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial proceedings involving this Agreement.'"  (*Hot Rods II*, *supra*, 242 Cal.App.4th at pp. 1175-1177.)  We concluded the referee erroneously interpreted the PSA between the parties to permit the introduction of extrinsic evidence at trial.  (*Ibid.*)  We found, due to the absence of this extrinsic evidence and for other reasons, including a lack of substantial evidence, that only $117,050 of the original damage award could be upheld. (*Id.* at p. 1185.)  We also affirmed the award of declaratory relief with respect to the indemnity clause and remanded for further proceedings.  (*Id.* at pp. 1182, 1186.)

On remand after *Hot Rods II*, the referee awarded a judgment of $117,050 in damages, $1,344,823.80 in attorney fees, and $258,390 in costs in favor of plaintiff Hot Rods.  The court also ordered declaratory relief regarding future losses, which we

3

will discuss *infra*. Northrop appealed the attorney fee award, which we ultimately affirmed. (*Hot Rods III*, *supra*, G054432.)

*Relevant Background Facts*

As we stated in *Hot Rods II*, *supra*, 242 Cal.App.4th at pages 1170-1171: "For many years, Northrop operated the property at 301 East Orangethorpe Avenue in Anaheim (the property) for the purpose of manufacturing floor beams for Boeing 747 aircraft. The facility was closed in the mid-1990's, and in 1994, Northrop retained Canonie Environmental (Canonie), a consultant, to conduct what was referred to as a 'Phase I Environmental Assessment' . . . of the property. . . . Canonie identified 15 areas of potential concern and recommended further investigation."

After a further investigation and second consultant's report, Northrop requested the Regional Water Quality Control Board (the Board) close the site. "The Board requested a work plan to address additional groundwater monitoring wells and quarterly water sampling. With respect to the soil, the Board indicated that contamination did not exist in concentrations that would require further cleanup at the time. If, however, information became available in the future that significant concentrations of contaminants existed, the Board might take further remedial action." (*Hot Rods II*, *supra*, 242 Cal.App.4th at p. 1171.)

"While this series of tests and discussions with the Board was ongoing, in mid-1995, Northrop began negotiations with Dan Welden to sell the property. . . . [¶] For Welden, who was looking for a new location for his auto parts reselling business, buying a property with unremediated contamination was a nonstarter. He did not want to be responsible for any cleanup costs." (*Hot Rods II*, *supra*, 242 Cal.App.4th at p. 1172.) The Weldens ultimately purchased the property for $3.5 million in December 1995, under a PSA that included numerous provisions pertinent to environmental liability and cleanup. (*Ibid.*)

4

The total area of the property, which is located in an industrial-zoned area[1] of Anaheim, is approximately 9.75 acres or 434,712 square feet. A series of buildings occupy the central portion of the site, and hundreds of parking spaces and a 25 to 35 foot wide drive aisle occupy the perimeter. The property's buildings, according to Hot Rods, have been fully occupied since 2013 primarily by two rent-paying tenants, an auto parts company owned by Weldon and a church. Those tenants pay an approximate total of $155,000 per month in base rent.

At the time Northrop sold the property to the Weldens in 1995, it reserved the right to use a 10-foot strip of land for a water system to treat deep water contamination. In 2003, the Board issued a cleanup and abatement order ordering Northrop to submit a plan to characterize and remediate the groundwater contamination. The contamination was more extensive than originally believed and included soil as well as groundwater contamination.

In 2004, a Northrop consultant submitted a plan at the direction of the Board, proposing several methods of recovering the contaminants released at the site. The proposed system was tested, installed and activated in 2008. It has operated on a continuous basis since 2008/2009. These remediation facilities include 86 wells, piping, and monitoring equipment, which are primarily located outside the buildings. Accessibility to this equipment requires a drive aisle, manhole access, a fenced equipment area, and parking spaces.

Over time, the rate of recovery of contaminants has slowed as the concentration has decreased. To put it mildly, this work is highly technical. Various issues have slowed down remediation, and government agencies have intervened and instructed Northrop to revise its plans. In 2020, the property was designated part of a

---

[1] Over 97 percent of the property is zoned industrial; approximately 2.69 percent is zoned as transitional. According to Hot Rods' appraisers, "the Transition zone has little bearing on the development potential of the property."

Superfund site by the Environmental Protection Agency (EPA). Much work – which is Northrop's responsibility – remains to be done.

*The Instant Litigation*

In November 2020, Hot Rods filed a motion seeking an order for Northrop to pay $1,847,902 for its loss between February 7, 2013 and September 30, 2020, a time period not covered by previous orders. Hot Rods' theory was that Northrop was liable for its use of approximately 59,000 square feet of the property for remediation activities. The motion was based, in part, on the language in the amended 2016 judgment, which stated: "[Northrop] shall be responsible to pay [Hot Rods] for any damage or reasonable future expense suffered by [Hot Rods] after the close of evidence in this case, February 7, 2013, arising from any Environmental Action(s) or Remediation (as those terms are defined in the PSA) involving environmental contamination or liability involving the Subject Property caused by any act or omission of [Northrop], its employees, agents and contractors, and any property damage (real or personal) arising out of hazardous materials used, handled, generated, transported, disposed or related by [Northrop] and its employees, agents and contractors at the Subject Property. This includes, without limitation, all reasonable future costs, losses, and other reasonable costs and expenses incurred by [Hot Rods] in connection with the foregoing events including but not limited to reasonable environmental consulting fees and reasonable attorneys' fees."

Additionally, Hot Rods sought $33,049 per month in rent beginning October 1, 2020, for Hot Rods' loss of use of approximately 76,000 square feet of the property. The rent would terminate when Hot Rods was no longer experiencing an alleged loss from the ongoing remediation activities. Hot Rods argued such relief was contemplated by the amended judgment entered on November 26, 2016 (the amended judgment), which ordered Northrop to pay for future costs and losses incurred by Hot Rods in connection with contamination or remediation activities.

6

Hot Rods' motion contended that Northrop's remediation activities, which had "no end in sight" had prevented it from redeveloping or rehabilitating buildings on the property. It argued that it was entitled to rent for four areas Northrop used to conduct remediation activity: the drive aisle around the property comprising 36,167 square feet; a manhole and access area (21,623 square feet) (eventually increased to 38,862 square feet due to a new installation); two parking spaces (174 square feet); subterranean piping (252 square feet);[2] a fenced equipment area (753 square feet); an electric transformer area (232 square feet); and an electric pole used for remediation (4 square feet). Only these four latter areas were alleged to be for Northrop's exclusive use, comprising 989 square feet.

According to Hot Rods, Northrop's remediation activities were accompanied by a persistent presence on the site that sometimes blocked part of the drive aisle. The monitoring activity also limited certain uses of the property, such as bolting into the walls or floors, without the consent of the Board and Northrop. In support of its motion, Hot Rods included an appraisal by its consultant, Integra Realty Resources (Integra), providing measurements, rent assessments, and other details.

Northrop argued that providing access to the property to perform the work, without requiring payment or limiting the space needed, was contemplated by the PSA. It also argued that Hot Rods' claim was barred by collateral estoppel and the statute of limitations. Northrop contended that Hot Rods could not recover under theories of trespass or unjust enrichment, and further, the purported loss was not akin to a temporary construction easement, as Hot Rods contended. Even if the use should be interpreted that way, the amounts Hot Rods sought were not supported.

In April 2021, the previous referee, Justice Wallin (ret.), recused himself from the case for personal reasons. A new referee was eventually appointed.

---

[2] This is the only area inside a building for which Hot Rods seeks rent.

The new referee found "that Justice Wallin previously determined that Hot Rods is entitled to compensation for loss of use of a portion of the Property, providing in the Statement of Decision that any future damages Hot Rods suffers for environmental contamination or remediation related to Northrop's activities on the Property remain Northrop's responsibility. Justice Wallin rejected Northrop's argument that it was entitled under the PSA to have access to, and use, any portion of the Property necessary for its remediation efforts without compensation to Hot Rods. While the Court of Appeal reversed Justice's Wallin's award of $1,000,000 in such loss of use damages, it did so based upon the lack of evidence supporting that amount (or any amount). The Court did not reverse Justice's Wallin's determination that damages for loss of use were recoverable." The referee also rejected Northrop's claims that the statute of limitations or collateral estoppel applied, because Northrop's liability had previously been determined: "[A]ll Hot Rods is seeking is damages which had not yet been incurred at the time of the trial in this matter." Because the amended judgment "ruled on the issue of damages under the PSA for loss of use" the referee did not reach the issues of unjust enrichment or trespass.

The referee found the fair market rental value was an appropriate measure of damages because the remediation was far more extensive than what was contemplated by the PSA. Hot Rods was also prevented from reconfiguring or redeveloping the property. Accordingly, the referee found rental value "an appropriate methodology for determining the value of a temporary construction easement." The referee concluded the back rent owed was $1,403,370 and "that the appropriate monthly rent from October 1, 2020 until remediation" was complete was $32,057, subject to future review every five years. Northrop now appeals.

8

II

DISCUSSION

*Impact of Documents, Orders, and Decisions*

At the outset, we must define the universe of information that will be used to decide this dispute. Obviously, the PSA is still in effect, and we interpret the PSA according to typical principles of contract law. Second, the amended judgment dated November 29, 2016, includes declaratory relief which remains in effect. Third, our prior published opinion in *Hot Rods II*, *supra*, 242 Cal.App.4th 1166, is law of the case for any issues addressed therein.

We are not, however, bound by Justice Wallin's findings or reasoning in his statement of decision, which was issued before our opinion in *Hot Rods II*. The statement of decision is separate from the judgment.

It is critical to understand the scope of declaratory relief afforded by the amended judgment. "[Northrop] shall be responsible to pay [Hot Rods] for *any damage or reasonable future expense suffered by [Hot Rods]* after the close of evidence in this case, February 7, 2013, arising from any Environmental Action(s) and/or Remediation (as those terms are defined in the PSA) involving environmental contamination or liability involving the Subject Property caused by any act or omission of [Northrop] . . . , and any property damage (real or personal) arising out of hazardous materials used, handled, generated, transported, disposed or related by [Northrop] and its employees, agents and contractors at the Subject Property. This includes, without limitation, all reasonable future costs, losses, and other reasonable costs and expenses incurred by [Hot Rods], in connection with the foregoing events including but not limited to reasonable environmental consulting fees and reasonable attorneys' fees." (Italics added.)

The words "damage," "future expense," and "future costs [and] losses" are key here. We interpret them to mean, in accordance with general principles of contract law, actually incurred damages. Uncertain and speculative damages are not recoverable.

9

(See *Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 975.)

*Standard of Review*

Legal issues, including the interpretation of contractual language, are reviewed de novo. (*Hot Rods II*, *supra*, 242 Cal.App.4th at p. 1178.) Factual findings are reviewed for substantial evidence. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1096.)

*Res Judicata and Statute of Limitations*

Northrop argues that Hot Rods' entire claim is barred by either the doctrine of res judicata, the statute of limitations, or both. We need not belabor this point. Hot Rods' motion was brought under the terms and within the scope of the declaratory relief awarded in the amended judgment, which permitted it to seek compensation "for any damage or reasonable future expense" arising from remediation. We find its request for damages here within the scope of the declaratory relief order, and therefore, we find that neither res judicata nor the statute of limitations apply to its claim.

We also disagree with Northrop that Justice Wallin's determination that damages for loss of use were recoverable was not binding on the current referee. It is binding because it is part of the declaratory relief portion of the amended judgment. Despite the fact that this court partially reversed the prior damage award, declaratory relief allowing such recovery was issued after remand in 2016. It was not the subject of an appeal. That determination is now final.

*The PSA Consented to Access to Conduct Remediation Activities*

The fact that the declaratory relief award permits Hot Rods to recover its losses as stated therein, however, is the beginning of the inquiry, not the end. As we shall

10

explain, we find the award of damages here was unsupported, based both on the relevant law and the evidence presented.

We begin with the PSA. Exhibit F to the PSA set forth remediation procedures. Among other things, Northrop was required to prepare a draft plan for remediation and select a contractor. The remedial work was not to "interfere with the flow of vehicle traffic on the Real Property or the normal operation of Buyer's business unless otherwise mandated by a government agency." Northrop was further required to provide Hot Rods with information about the contractor, a description of the proposed scope of work and schedule, quarterly reporting, and other information. Northrop was required to "use its best efforts to undertake work so as not to interfere with normal business operations" and Hot Rods was required to provide access "necessary for the responsible party to perform the Remedial Work."

We apply the ordinary principles of contract interpretation to the PSA. As we noted in *Hot Rods II*, *supra*, 242 Cal.App.4th at page 1178, "'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' [Citations.] 'The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.' [Citation.] 'Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further.'"

We conclude the only reasonable interpretation of Exhibit F is that it granted Northrop permission to conduct the work necessary to remediate the property, even if it was beyond the scope of the groundwater cleanup that was originally contemplated. One provision in Exhibit F states: "Unless otherwise required by a governmental agency, wells and equipment including, without limitation, any pipes must be located within a ten-foot wide strip of land along the East, West, or North property lines at the Real Property." The Regional Board has required Northrop to conduct

11

remediation beyond this strip of land, but Hot Rods contends it is not required to provide access to any other part of the property rent free.

An interpretation of the PSA as anything but providing consent to access the parts of the property necessary to conduct remediation would lead to an absurd result. Northrop would be required to pay for the privilege of conducting both necessary and government-mandated environmental cleanup, regardless of whether remediation activities caused Hot Rods any actual harm. This was *not* contemplated by the PSA, which under its terms treated both parties as sophisticated and stated each had consulted with professional advisors. The PSA defined "Hazardous Materials" broadly, to include "any substance, . . . whose nature and/or quantity of, presence, or effect at the Real Property render it subject to Environmental Laws as being potentially injurious to public health or the environment." Further, the term "Hazardous Materials Conditions" is defined to mean "the presence on, in or under the Real Property of Hazardous Materials . . . that requires Remediation and/or removal under standards established and required by applicable Environmental Laws." The PSA contemplated that environmental remediation could be more expansive than the parties knew at the time of the PSA's execution, and the environmental indemnity provision provided for such contingencies. Northrop made no "representations or warranties regarding the compliance of the Real Property and Improvements with Environmental Law."

As we noted in *Hot Rods II*, it was important to Welden at the time the PSA was negotiated and executed that he not be responsible for any environmental cleanup costs. (*Hot Rods II*, *supra*, 242 Cal.App.4th at p. 1172.) The PSA reflects this with its carefully drafted indemnity and cleanup provisions. It also follows that to implement cleanup, Northrup must be given access to any parts of the property where environmental remediation is required. Accordingly, we interpret the PSA as providing consent for Northrup to access the property to conduct remediation. No payment for this is contemplated by the PSA, and therefore none is necessary.

*Hot Rods is Entitled to Actual Damages Only*

Under the PSA, as interpreted by the amended judgment, Hot Rods is entitled to damages or reasonable expenses incurred as a result of Northrop's environmental remediation activities. If Northrop's activities result in a building exploding, for example, Northrop would be liable. If one of Northrop's trucks knocks out several electrical poles and nobody can work on the property for the days it takes power to be restored, Northrop would be liable. But Northrop is not liable for hypothetical or speculative losses.

The referee's award was based almost entirely on the report of Hot Rods' consultant, an appraisal which assessed "damages" for Northrop's use of the property for remediation activities. As we stated above, Hot Rods is not entitled to compensation under a rent theory, given the consent Hot Rods provided to Northrop to conduct cleanup activity stated in the PSA.

The appraisal upon which the referee relied, as we summarized above, added up the entire square footage that Northrop apparently touched at any point during remediation, with the exception of the strip of property identified specifically in the PSA. The appraiser's calculations specified the largest portion, the drive aisle around the property which comprised 36,167 square feet, and a manhole and manhole access area, which comprised 21,623 square feet. However, less than 1,000 square feet of the area for which Hot Rods sought "rent" was exclusively used by Northrop, Hot Rods' own evidence demonstrated that Northrop used the drive aisle and manhole access areas only intermittently, and Hot Rods submitted no evidence it suffered a financial loss as a result.

Hot Rods argues that we should treat Northrop's use of the property as a temporary construction easement, but the cases it cites deal with exclusive possession of property. (See, e.g., *Property Reserve, Inc. v. Superior Court* (2016) 1 Cal.5th 151, 199.) Because Northrop's use of the majority of the contested square footage is intermittent, we find this analogy misguided. Further, Northrop's use is covered by Hot Rods' consent for

13

Northrop to conduct remediation activities as stated in the PSA. Accordingly, Hot Rods is only entitled to actual damages.

We find no evidence of damages here that would support this award. There were minor problems, such as improperly bolted manhole covers that "people say" caused flat tires, with complaints occurring less than once a month. Generally, the manhole covers can be driven over. There was no evidence that such complaints caused Hot Rods any direct financial losses. Northrop's contractors have occasionally blocked off the entire driveway, but less than once a year. When the contractors blocked a loading dock, they moved when asked to do so. Again, there is no evidence of specific financial losses tied to these inconveniences.

Nor is there evidence of lost rent: the leased buildings on the property have been occupied since 2013. Welden testified he had no knowledge that either of Hot Rods' tenants had avoided using any part of the property due to fear of contamination. No tenant had even threatened to withhold rent due to remediation activities on the property.

In short, we can find no evidence of actual damages or losses incurred by Hot Rods to justify the referee's award of past "rent," and obviously, any future losses are pure speculation at this point. Accordingly, both must be reversed.

Hot Rods is entitled only to damages or reasonable expenses incurred as a result of Northrop's environmental remediation activities. This opinion does not foreclose Hot Rods from seeking such damages in the future, but such damages must be tied to actual, demonstrable losses. As contemporary vernacular might put it, Hot Rods must show the receipts. While the scope and length of the cleanup to this property is unfortunate, it was always a possibility, and that possibility was, or should have been, baked into the sale price the Weldens agreed to pay. Hot Rods cannot claim damages for speculative losses or opportunity costs it reasonably should have considered at the time it purchased an environmentally compromised property.

14

### III

### DISPOSITION

The postjudgment order is reversed.  Northrop is entitled to its costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


GOODING, J.